Joann S. REED, Plaintiff–Appellee–
Cross–Appellant,

v.

A.W. LAWRENCE & CO., INC.,
Defendant–Appellant–
Cross–Appellee.

Nos. 1121, 1467, Dockets 95–7770, 95–7831.

United States Court of Appeals,
Second Circuit.

Argued March 4, 1996.

Decided Sept. 11, 1996.

James D. Featherstonhaugh, Albany, NY (Nadine Feiden Shadlock, Featherstonhaugh, Conway, Wiley & Clyne, LLP, on the brief), for defendant-appellant.

Ronald G. Dunn, Albany, NY (Gleason, Dunn, Walsh & O'Shea, on the brief), for plaintiff-appellee.

Before: MINER, JACOBS, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

In this appeal from a judgment entered by the United States District Court for the Northern District of New York (Thomas J. McAvoy, *Chief Judge*), we consider, among other things, the factors necessary to establish a *prima facie* case of retaliatory dis-

charge. The plaintiff, Joann Reed ("Reed," "plaintiff," or "employee"), claimed that her former employer, A.W. Lawrence & Co., Inc. ("Lawrence," "defendant," or "employer") discharged her in retaliation for complaining about a vulgar comment made to her by a co-worker. Reed alleged that the employer's response to her complaint—firing her—violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and N.Y. Exec. Law § 290 *et seq.* (McKinney 1993). At the close of the plaintiff's case, the defendant moved for judgment as a matter of law. The district court deferred ruling on that motion and instructed the defendant to proceed with its case. Lawrence elected not to present any witnesses but, rather, to rely on the evidence presented by the plaintiff, its own cross-examination of witnesses and its opening and closing statements, as well as its motion for judgment as a matter of law.[1]

■ The jury returned a verdict for the plaintiff on her New York state law claims, awarding her back pay and compensatory damages. Following the return of the jury's verdict, the defendant renewed its motion for judgment as a matter of law. In its Memorandum, Decision and Order of July 3, 1995, the district court denied the defendant's motion and resolved the plaintiff's Title VII claims in favor of the plaintiff.[2] The defendant appeals the district court's denial of its motion and the award to Reed of "front pay" and attorneys' fees. In its cross-appeal the plaintiff challenges the omission of pre-judgment interest in the judgment of the district court, the limitation on her front pay award, and the denial of a portion of her attorneys' fees.

We affirm the judgment of the district court in all respects, other than with regard to the reduction of the award of attorneys' fees by the amount attributable to the litigation of the fee award, and we remand for the sole purpose of having the district court recompute the award of attorneys' fees and awarding pre-judgment interest in a manner consistent with this opinion.

## I. BACKGROUND

Because the defendant rested without presenting any witnesses at trial, the facts we describe are drawn entirely from the record of the testimony of the plaintiff's witnesses, and of exhibits presented by both parties.

The plaintiff claims that she was fired by the defendant on October 1, 1991, in retaliation for voicing her objections to a comment made to her by a co-worker, Chuck Infantino. The defendant contends, in response, that the plaintiff's dismissal was due to the plaintiff's poor performance as well as the lack of profitability of the one-person office she operated for the defendant in Lake Placid, New York.

The defendant is part of an interrelated group of insurance companies known as the Lawrence Group and employs more than 500 employees. At the time she was fired, the plaintiff had worked for the defendant in several capacities over a period of five years, but from 1987 until she was dismissed in late 1991, she had operated the one-person Lake Placid office and had coordinated the defendant's entry into the "sports insurance" market. In the spring of 1991, the plaintiff and

---

1. FED.R.CIV.P. 50 (as amended in 1993), provides for judgment as a matter of law. Rule 50(a) provides that once a party has been fully heard on an issue the opposing party may move the court to find against the non-moving party where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving party] ... and may grant a motion for judgment as a matter of law against that party." Rule 50(b) provides for the renewal of the motion for judgment as a matter of law after the jury has returned a verdict and the "court may, in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law."

2. Because this action concerns conduct occurring before the enactment of the 1991 amendments to the Civil Rights Act, Reed was not entitled to a jury verdict on her Title VII claims. *Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The district court resolved the Title VII claims in accordance with the jury's determinations on the state law claims. *Cf. Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1048 (2d Cir.1992) (requiring a district court to "resolve the Title VII claims in accordance with the jury's determination on the [New York state] claim"). The parties agree that the jury verdict is the proper "locus of error" for both Reed's Title VII and state law claims.

two other Lawrence employees, Infantino and Gerald Lumley, were part of a "team" assembled to prepare a competitive bid for the sports-insurance account of the World University Games.

The plaintiff's relationship with the other team members led ultimately to this lawsuit. The plaintiff believed that she was not "getting the proper credit for what she [did] and felt being a female she wasn't as appreciated," and consequently had difficulty working with her two male co-workers. She testified, in addition, that when working with Lumley on the World University Games project, he had told her that "[she] was acting like a *bitch in heat* and he was just not happy working with [her]." (Emphasis added.) On September 12, 1991, the plaintiff, Infantino, and Lumley agreed, after a meeting in Buffalo with Lawrence's prospective client, that they would return to their respective home offices (Infantino worked in the defendant's branch office in Syracuse and Lumley worked in the defendant's head office in Schenectady) and each would "jot down [their] notes over the night, think about it, [and] hook up in the morning about what to put in the addendum." The following morning, Infantino and the plaintiff engaged in a "heated telephone conversation," which the plaintiff at trial described as follows:

> So, the next morning I called Gary [Lumley], got some information. I called Chuck [Infantino] and said, okay, Chuck, let's talk about the addendum and what do you want to put in. *Chuck said, I have it all done, I will fax it to you, you can type it up and mail it out. I want it overnight to The World University Games.* And frankly, I was irritated. I had wasted my time the night before working late thinking about what did I want in the addendum. So, I said, well, jeez, Chuck, like the good little secretary, I will type it up. And Chuck said to me, Joanne, *if you think my pecker is getting in the way*—and I just had it and I hung up the phone.

(Emphasis added.)[3] Infantino called back later that morning; it is not disputed that he apologized to the plaintiff, but the record is unclear as to whether he apologized when he first called the plaintiff back or in a phone call to her home a few days later.

According to the plaintiff, five days after the "heated telephone conversation," she discussed Infantino's remark with Rita Harfield, a personal friend and a vice president of both Lawrence and another Lawrence Group company, because she was uncertain as to how to deal with Infantino's "aggressive behavior" and because she believed that this latest in a series of incidents interfered with her working relationship with her co-workers. Harfield replied that the comment was vulgar and inappropriate, and advised the plaintiff to report it to the defendant's personnel director. The plaintiff did not do so because, she claims, she was afraid of retaliation. Reed testified that she told Harfield, "I know what The Lawrence Group does to people like that, I heard stories about it. I know what happens with people in the company that complain about this." Harfield nevertheless called Lawrence's personnel director, Carmella Roberson, to report the incident. Harfield also spoke with Gary Keehfus, the plaintiff's supervisor and a close friend of Infantino. It is undisputed that at the time of the incident the defendant had no policy, written or otherwise, with respect to sexual harassment complaints.

Keehfus asked Roberson to arrange a meeting with the plaintiff and Infantino to discuss the incident. The plaintiff travelled at the request of Keehfus to the head office in Schenectady, on September 26, 1991, but claims that initially she believed that she had been summoned there to discuss marketing with Keehfus. Upon her arrival, to the plaintiff's surprise, she met instead with Roberson to discuss Infantino's comment and apology. Roberson also met separately with Infantino, who admitted making the vulgar comment. Roberson, without conducting any further investigation of the incident or of the plaintiff's working conditions, reported to

---

**3.** While the dissent may speculate as to how Infantino intended to complete the offensive sentence, the fact remains that the defendant never presented any evidence to suggest that Infantino's remark was benign.

Keehfus that she considered the matter closed.

Later that same day, the plaintiff met with Keehfus. Although she had been expecting to discuss marketing with Keehfus, he instead confronted the plaintiff regarding the operations of the Lake Placid office and her job performance. The plaintiff testified that Keehfus told her that he considered her "weird," and that she "should be more like Chuck Infantino because there's somebody that's going to go far in this company." Keehfus also told Reed that he was unhappy with her performance and her practice of making personal phone calls at work. She was instructed to "keep expenses to the bare bones" and to report by fax to the Schenectady office her whereabouts while at work as well as her arrival and departure times.[4] One week later, on October 1, 1991, Keehfus telephoned the plaintiff and fired her. That same day, Reed telephoned Bill Mather, another Lawrence supervisor, to find out why she had been fired. Reed testified that Mather simply told her that she had been fired because "[she wasn't] being a *team player*." (emphasis added.)[5] Keehfus subsequently sent Reed a letter stating that she had been discharged because of "poor job performance."

■ On February 26, 1992, the plaintiff filed a complaint with the New York State Division of Human Rights ("SDHR"), alleging that she had been discriminated against on account of her sex. Because New York is a so-called "deferral" state, the complaint was deemed concurrently filed with the EEOC. *See* 42 U.S.C. § 2000e–5(e)(1) (1994); 29 C.F.R. § 1601.13(a) (EEOC's deferral policy and procedures); 29 C.F.R. § 1601.74 (1995) (SDHR accepted as a "deferral agency"); *see also Yoonessi v. State University of*

*New York,* 862 F.Supp. 1005, 1013 (W.D.N.Y. 1994), *appeal denied,* 56 F.3d 10 (2d Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 779, 133 L.Ed.2d 730 (1996). The EEOC issued a right-to-sue letter on September 2, 1992, and the SDHR, on November 27, 1992, dismissed the complaint pending before it on the basis of "administrative convenience," thereby enabling the plaintiff to sue on her state law claims as well. *See* N.Y. EXEC. LAW § 297(9) (McKinney 1993)(once SDHR dismisses complaint for "administrative convenience" plaintiff may bring suit in "any court of appropriate jurisdiction"). Now able to pursue her claims in the courts, the plaintiff commenced the instant action on December 1, 1992. Although her complaint initially included claims under the "hostile work environment" provisions of the EEOC's Guidelines, *see* 29 C.F.R. § 1604.11 (1995), the plaintiff voluntarily withdrew those claims by a stipulation dated July 28, 1994, and thereafter pursued only her remaining retaliation claims under 42 U.S.C. § 2000e–3(a) and N.Y. EXEC. LAW § 296(1)(e) (McKinney 1993).[6]

■ The case went to trial before Chief Judge McAvoy on September 13, 1994. At the close of the plaintiff's case, the defendant moved for dismissal of the action, pursuant to FED.R.CIV.P. 50(a), on the grounds that Reed had failed to make out a prima facie case of retaliatory discharge. The court reserved decision on the motion and instructed the defendant to present its case. The defendant instead elected to rest without calling any witnesses. On September 15, 1994, the jury returned a verdict on the state law claims in favor of the plaintiff, awarding her $5,000 in damages for emotional pain and

---

**4.** The plaintiff testified that she told Keehfus that the Lake Placid office was financially strong, but appeared to be losing money only because profits that should have been attributed to the Lake Placid office were attributed to other parts of the company, and because expenses related to projects of other Lawrence offices were attributed to the Lake Placid office. The plaintiff also claimed that the phone calls referred to by Keehfus were mostly related to business trips she had made for Lawrence.

**5.** According to Reed's testimony, this comment came out of the blue, as just a few weeks prior to being fired, she had spoken with Mather, who

told her "what a great job [she] was doing on the World University Games."

**6.** Insofar as Reed did not allege that she was denied an economic benefit on account of her gender or because she rejected a sexual advance by a co-worker, Reed could not proceed under the other theory of sexual harassment, the so-called *quid pro quo* theory. *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992). *See generally,* 29 C.F.R. 1604.11(a) (proscribing both hostile work environment and *quid pro quo* forms of sexual harassment).

anguish and $60,000 for lost wages and benefits. Following the return of the verdict, the defendant renewed its motion for judgment as a matter of law, pursuant to FED.R.CIV.P. 50(b), and the plaintiff moved for front pay and attorneys' fees.[7]

In a comprehensive Memorandum, Decision, and Order dated July 3, 1995, the district court denied the defendant's Rule 50(b) motion and awarded the plaintiff $4,038.46 for seven weeks of front pay and $54,417.28 in attorneys' fees. The court denied the plaintiff pre-judgment interest and denied attorneys' fees of $1,662.50 incurred in the preparation of the attorneys' fees claim.

## II. DISCUSSION

### A. *The Retaliatory Discharge Claim*

Title VII and N.Y. EXEC. LAW § 290 *et seq.* (McKinney 1993) provide the bases for Reed's claims in this case. Title VII prohibits the firing of employees in retaliation for their opposition to discriminatory practices or their participation in an investigation under Title VII. 42 U.S.C. § 2000e–3(a).[8] Similarly, New York's Executive Law prohibits the discharge of employees in retaliation for their opposition to discriminatory practices or their participation in an investigation under the New York Human Rights Law.[9]

■ We consider Reed's state law claims in tandem with her Title VII claims because New York courts rely on federal law when determining claims under the New York Human Rights Law. *Tyler v. Bethlehem Steel*

*Corp.*, 958 F.2d 1176, 1180 (2d Cir.), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992) ("New York courts have consistently looked to federal case law in expounding the [New York] Human Rights Law"); *New York State Office of Mental Retardation v. New York State Div. of Human Rights,* 164 A.D.2d 208, 563 N.Y.S.2d 286, 287 (3rd Dept.1990) ("we adopt ... the Federal standard for retaliatory discrimination cases").

■ We review *de novo* the denial of a motion for judgment as a matter of law. *EEOC v. Ethan Allen, Inc.,* 44 F.3d 116, 119 (2d Cir.1994). In doing so, we "must view the evidence in the light most favorable to the party against which the motion was made ... making all credibility assessments and drawing all inferences in favor of the non-movant." *Id.* (internal quotation marks and citations omitted).

In denying the defendant's motion for judgment as a matter of law, Chief Judge McAvoy held that Reed had presented sufficient evidence for the jury to find that she (1) established a prima facie case of retaliatory discharge; (2) proved that the non-discriminatory reasons proffered by the defendant for her dismissal were merely a pretext; and (3) proved that her dismissal was due, at least in part, to her complaint about Infantino's comment.

### 1. *Plaintiff's Prima Facie Case*

■ Retaliatory discharge in violation of Title VII occurs when "a retaliatory motive

7. The award of front pay lies within the discretion of the district court. *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 145 (2d Cir.1993), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). Attorneys' fees are not available under N.Y. EXEC. LAW § 296 (McKinney 1993), but are available in Title VII cases under 42 U.S.C. § 2000e–5(g).

8. 42 U.S.C. § 2000e–3(a) provides, in pertinent part, that

[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ..., because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

An "unlawful employment practice," in turn, is defined in pertinent part as an action by an employer that

discriminate[s] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000–2(a)(1).

9. N.Y. EXEC. LAW § 296(1)(e) (McKinney 1993), provides, in pertinent part, that

[i]t shall be an unlawful discriminatory practice ... [f]or any employer ... to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under [the Human Rights Law] or because he has filed a complaint, testified or assisted in any proceeding under [the Human Rights Law].

plays a part in [the discharge], ... whether or not it was the sole cause ... [or] when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist." *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993). The allocation of burdens of proof in retaliation cases follows the general rules enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also Sumner v. United States Postal Serv.*, 899 F.2d 203, 208 (2d Cir.1990). To establish a prima facie case for retaliation, a plaintiff must show that (1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988).

▆▆▆▆ Three of the four factors required to show a prima facie case were easily proved by Reed: (1) Lawrence was aware that the plaintiff was complaining about a coworker's allegedly unlawful conduct—by complaining to an officer of the company, Rita Harfield, and maintaining her complaint during the subsequent internal investigation of the matter, the plaintiff was in effect communicating her concerns about Infantino's comments to Lawrence; (2) Reed suffered an adverse employment decision—she was fired; and (3) the causal connection—which "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action," *Manoharan*, 842 F.2d at 593—was shown in this case by, among other things, evidence that the time between the plaintiff's initial complaint and her discharge was a mere twelve days. The one remaining factor—whether the plaintiff was engaged in "protected activity" when she complained about Infantino's alleged unlawful conduct—is the focus of this appeal.

The defendant argues that the plaintiff did not present a prima facie case of retaliation because she failed to demonstrate that her complaint constituted "protected activity"— that is, *opposition* to an unlawful employment practice. The defendant presses two arguments in support of this claim: (1) The plaintiff could not have had a *reasonable* good faith belief that Infantino's comment constituted an unlawful employment practice and therefore, her complaint was not protected opposition; and (2) Infantino's comment cannot, as a matter of law, be considered an unlawful act *by the plaintiff's employer.*

### a. Good Faith, Reasonable Belief

▆▆▆▆ The defendant's argument that Infantino's comment cannot be considered an unlawful employment practice highlights a recurring theme in retaliation cases: an employee "need not establish that the conduct [s]he opposed was in fact a violation of Title VII," but rather, only that she had a "good faith, reasonable belief" that the underlying employment practice was unlawful. *Manoharan* 842 F.2d at 593 (holding that to prove that she was engaged in "protected activity," an employee need only have a "good faith reasonable belief that the underlying challenged actions of the employer violated the law"); *see also Cosgrove*, 9 F.3d at 1039. It is not disputed that the plaintiff believed in good faith that Infantino's comment subjected her to an unlawful employment practice. We must therefore address whether the record supports the jury's finding that this belief was reasonable. If so, her objection to Infantino's comment would have to be considered "protected activity."

▆▆▆▆ We review the record in this case in light of *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), where the Supreme Court instructed the lower federal courts that the test for the existence of a hostile work environment "is not, and by its nature cannot be, a mathematically precise test.... But ... *whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.*" *Harris*, 510 U.S. at 22–23, 114 S.Ct. at 371 (emphasis added). More-

over, the public has frequently been reminded, by courts and by commentators, that the subjective sensibilities of an alleged victim may be a relevant consideration in determining whether conduct by a supervisor or a co-worker is legally sanctionable.[10] *See, e.g., Ellison v. Brady*, 924 F.2d 872, 878–79 (9th Cir.1991) (When "evaluating the severity and pervasiveness of sexual harassment ... the perspective of the victim" should be the focus of the inquiry); Jolynn Childers, Note, *Is there a Place for a Reasonable Woman in the Law? A Discussion of Recent Developments in Hostile Environment Sexual Harassment*, 42 Duke L.J. 854 (1993). It cannot be denied that we live in a time of significant cultural change, in which varieties of coarse conduct once taken for granted in the American workplace appear to be subject to punishment under the law. *See, e.g.,* Eugene Volokh, *Freedom of Speech and Appellate Review in Workplace Harassment Cases*, 90 Nw.U.L.Rev. 1009, 1010–19 (1996) (listing examples of commonplace circumstances that lead to workplace harassment lawsuits). We also note that in mid–1991, the period immediately preceding the events that form the basis for this suit, the popular press devoted a vast amount of attention to the issue of sexual harassment, *see, e.g.,* Leigh Montville, *Season of Torment; After Months of Anguish, Reporter Lisa Olson Sues the Patriots for Sexual Harassment,* Sports Illustrated, May 13, 1991, at 60 (discussing much-publicized football locker-room harassment of female reporter); *Citing Sexism, Stanford Doctor Quits,* N.Y. Times, June 4, 1991, at A22 (describing circumstances surrounding "front page" story of alleged sexual harassment of renowned Stanford University surgeon by her colleagues); Elizabeth L'Hommedieu, *Walking Out on the Boys,* Time, July 8, 1991, at 52 (same), and how seemingly minor events could trigger allegations of a "hostile work environment." *See, e.g., Ending Sexual Harassment: Business Is Getting the Message,* Bus. Week, March 18, 1991, at 98 (addressing, among other sexual harassment topics, emergence of "reasonable woman" standard and noting that courts are "stretching the definition of sexual harassment"); Ted Gest, *The New Meaning of Equality,* U.S. News & World Rep., June 17, 1991, at 48 (reporting expansion of definition of sexual harassment to include "sexually degrading [work] atmospheres").[11]

In light of our reading of the record of this case as a whole, we cannot say that the jury's conclusion here—that Reed reasonably and in good faith believed, at the time of her complaint, that she was the victim of a "hostile work environment"—was irrational or that, as a matter of law, it was a conclusion that reasonable persons could not have reached. While the plaintiff likely would not have passed the "good faith reasonable[ness]" test of *Manoharan* if the only evidence offered at trial had been Infantino's isolated comment,[12] a review of the record reveals that the evidence presented to the jury included more than this one remark. At trial, the plaintiff provided uncontroverted testimony of conduct by Lumley (the other male co-worker with whom the plaintiff was then working closely), that, when considered in conjunction with Infantino's comment, could have led the plaintiff reasonably to believe that she was the victim of a "hostile work environment." Reed testified that Lumley "told me I was acting like a bitch in heat and he was just not happy working with me." In addition, Infantino sparked the confrontation that led him to refer to his "pecker" by ordering Reed, a peer, to type up a report and send it "overnight" to the client. It is conceivable that Reed believed that Infantino was treating her as a subordinate

---

**10.** We merely draw attention to these views, without commenting on them, to show what ideas could have been in the plaintiff's mind when she was evaluating whether or not to complain about Infantino's conduct to her employer.

**11.** A brief search in just one of the magazine electronic databases revealed that since January 1, 1990, over 150 popular magazine articles have covered the subject of sexual harassment. Search of Lexis/Nexis, News Library, Mags file (August 20, 1996).

**12.** Because the record in this case provides evidence of other conduct that could have been perceived as discriminatory, we do not suggest, much less decide, that one comment, standing alone, could support a reasonable belief that an employee was suffering unlawful, discriminatory employment conditions.

rather than an equal because she was a woman. Evidence presented at trial also suggested that, even before the incident with Infantino, "[the plaintiff] felt that she was not getting the proper credit for what she does and felt [that] being a female she wasn't as appreciated [as her male co-workers]."

The jury found, on the basis of the uncontroverted evidence presented by the plaintiff, that prior to her discharge, the plaintiff reasonably and in good faith believed that she had been the victim of a species of sex discrimination.[13] When placed in the larger context of the plaintiff's employment experience at Lawrence, Infantino's objectionable comment to the plaintiff was not an isolated event. Reed could reasonably have perceived Infantino's comment as merely the last in a series of incidents that led her to believe that she was the victim of a hostile work environment.

### b. *Employer Liability for Co–Worker Practices*

Lawrence also argues that the plaintiff's complaint about Infantino cannot be considered protected activity under Title VII because Infantino's comment was an isolated utterance by an individual co-worker that, as ℯ matter of law, cannot be the basis for holding the employer liable. *Karibian v. Columbia Univ.*, 14 F.3d 773, 779 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994) (" [A] plaintiff seeking to establish harassment under a hostile environment theory must demonstrate some specific basis to hold the employer liable for the misconduct of its employees.").

■ In order to impute to an employer liability for the actions of an employee, we are expected to apply common law principles of agency. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). In sexual harassment cases, we have interpreted these principles to require that "a plaintiff ... prove that the

employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it" in order for the employer to be held liable. *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 63 (2d Cir.1992); *see Karibian,* 14 F.3d at 780.

■ The plaintiff argues that the absence of a "written sexual harassment policy" was a sufficient ground for imputing Infantino's misconduct to his employer. However, there is no basis for a *per se* rule that the absence of a written sexual harassment policy, standing alone, permits a finding that the employer has failed to "provide [a] reasonable avenue for complaint" or that the employer "knew of the harassment but did nothing about it." *Id.* While the EEOC Guidelines require employers to "take all steps necessary to prevent sexual harassment from occurring," 29 C.F.R. § 1604.11(f), there is no rule requiring the creation of formal written procedures to deal with allegations of sexual harassment.

■ Likewise, the defendant's argument—that Infantino's asserted misconduct cannot be imputed to his employer, because Lawrence provided a procedure for use by aggrieved employees and the plaintiff had recourse to that procedure—oversimplifies the required analysis. We know of no authority, and none has been drawn to our attention, to support the defendant's suggestion of an alternative *per se* rule that the availability of a complaint procedure and an investigation of the complaint under that procedure, standing alone, requires us to reach the legal conclusion that the misconduct of a co-worker cannot be imputed to the employer. In fact, the Supreme Court has explicitly "reject[ed][the] view that the mere existence of a grievance procedure and a policy against discrimination, coupled with [the employee's] failure to invoke that procedure, must insulate [the employer] from liability." *Meritor Sav. Bank,* 477 U.S. at 72, 106 S.Ct. at 2408. A *per se* rule is no more appropriate where,

---

**13.** The jury was instructed by Chief Judge McAvoy that it should "consider ... the following elements: ... that the plaintiff reasonably believed, in good faith, that the co-worker's comment violated the law.... It's important to note that in regard to the [above] element, that the plaintiff does not need to prove that her co-worker's actions in making the offensive comment actually violated the law. Instead, it is only necessary that the plaintiff prove she had a good faith reasonable belief that her co-worker's comment violated the law."

as here, the employee does invoke the grievance procedure established by an employer. *See Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986) (employer has "good faith" duty to take "reasonable" and "feasible" measures to remedy discriminatory environment). A *per se* rule of the sort suggested by the defendant would permit employers to fire grievants with impunity simply for "making trouble" by filing a grievance against well-regarded or well-protected supervisors and co-workers.

■ The question of whether an employer has provided a "reasonable avenue of complaint" is a question for the jury, *see Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987) (whether employer has taken reasonable steps to remedy discrimination is question of fact), whose inquiry is informed by the evidence as a whole, including evidence of the motivations and actions of the employer between the time the grievance procedure is concluded and the time the employee is discharged. In the instant case, there is sufficient evidence from which a jury could conclude that the defendant's procedures did not "provide a reasonable avenue of complaint." There is also evidence, including the post-grievance actions of the employer, from which the jury could reasonably conclude that the "employer . . . knew of the harassment but did nothing about it," *Karibian*, 14 F.3d at 780—indeed, there is evidence that what the employer did in response to the inappropriate conduct was to get rid of the employee who complained about it.[14] In these circumstances, the jury could impute Infantino's conduct to Lawrence, and could conclude that the plaintiff's complaint was protected "opposition" under Title VII and N.Y. Exec. Law § 296 (McKinney 1993). In light of this evidence the jury could reason-ably have found that the plaintiff had met her burden to show a prima facie case of retaliatory discharge.

### 2. Plaintiff's Burden to Refute Defendant's Stated Reasons for Discharging Plaintiff

■ Once the plaintiff has presented a prima facie case of retaliation, the burden "shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason' for its action." *Sumner*, 899 F.2d at 209 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093). If the defendant states a legitimate reason for its action, the burden then shifts back to the plaintiff to prove that the proffered reason is a pretext. *Id.*

■ Lawrence argues that, based on the evidence presented at trial, no reasonable jury could have found that the plaintiff had sustained her burden of establishing that the defendant's stated reasons for firing her were a mere pretext. This argument borders on the frivolous. The plaintiff presented unrefuted testimony that (1) Lawrence's misleading bookkeeping practices accounted for the ostensible lack of profitability of the Lake Placid office; (2) she had not abused phone privileges, as her employer had alleged; and (3) she had previously received good or excellent reviews. In these circumstances, we find that the jury could reasonably have found that the plaintiff had satisfied her burden of proving that the defendant's proffered reasons for firing her (the office's lack of profitability and her poor performance) were pretextual.

### 3. Plaintiff's Burden to Prove She Was the Victim of Discrimination

■ The district court properly instructed the jury regarding the plaintiff's various

---

**14.** The uncontroverted evidence in this case includes: the lack of adequate time given to the personnel director to investigate the plaintiff's allegation before her interviews with the plaintiff and Infantino; the fact that other co-workers were not interviewed regarding the plaintiff's work environment; the fact that the plaintiff did not know that she was to be interviewed about the comment by the personnel director until she actually arrived at the head office in Schenectady; the rapid closing of the issue by that same personnel director; the meeting immediately thereafter for a "dressing down" by her boss who even told her to model herself on Infantino, the very co-worker whose conduct prompted the inquiry; and finally, the discharge of the plaintiff soon after the conclusion of the inquiry by the personnel director. The plaintiff also testified that she was so uncomfortable with the complaint process that she never voluntarily availed herself of it and she expressed serious reservations about the effect on her job if she attempted to use the informal complaint procedures. "I know what the Lawrence Group does with people like that, I heard stories about it. I know what happens to people in the company that complain about this."

burdens, requiring proof by a preponderance of the evidence that the employer's proffered reasons for terminating Reed were pretextual and that the plaintiff was the victim of unlawful discrimination by Lawrence.[15] *St. Mary's,* 509 U.S. at 511, 113 S.Ct. at 2749 (holding that, after the defendant's offer of legitimate reasons for its action, the "trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated" (internal quotation marks and citation omitted)). Our review of the evidence presented to the jury persuades us that the jury could reasonably have concluded that the plaintiff proved, by a preponderance of the evidence, that she was unlawfully discharged in retaliation for her opposition to her co-workers' unlawful conduct. Accordingly, the district court did not abuse its discretion in denying the defendant's FED.R.CIV.P. 50 motions for judgment as a matter of law.

## B. *The Front Pay Claim*

 Reed claims in her cross appeal that the district court abused its discretion in limiting her "front pay" award to only seven weeks' salary. Front pay is awarded in the sound discretion of the district court, *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 145 (2d Cir.1993), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994), where reinstatement is inappropriate and the plaintiff has been unable to find another job, in order to " 'mak[e] victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment.' " *Padilla v. Metro–North Commuter R.R.,* 92 F.3d 117, 125–26 (2d Cir.1996) (quoting *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 729 (2d Cir. 1984)). A plaintiff has the duty to exercise reasonable diligence in mitigating damages by seeking alternative employment. *See Dunlap–McCuller v. Riese Org.,* 980 F.2d 153, 159 (2d Cir.1992), *cert. denied,* 510 U.S. 908, 114 S.Ct. 290, 126 L.Ed.2d 239 (1993).

Chief Judge McAvoy found that the plaintiff was entitled to front pay because the antagonism between the parties would make reinstatement inappropriate, and the plaintiff had made a "good faith effort" to mitigate her damages. However, the court limited plaintiff's front pay to seven weeks' salary because the Lake Placid office had been scheduled to close on November 1, 1994, seven weeks after the jury rendered its verdict in the plaintiff's favor on September 15, 1994. It thus appears that the plaintiff would have been out of a job in any event on November 1, 1994. *See Saulpaugh,* 4 F.3d at 145 (district court's denial of front pay held not an abuse of discretion, where plaintiff was disabled after termination and would therefore not then have been able to continue working). Because the plaintiff's job was scheduled to be eliminated in any case, an award of front pay beyond that date would have impermissibly placed her in a better position than she would have been in had she not been fired. We conclude that, in these circumstances, the district court's limitation of front pay to only seven weeks' salary was not an abuse of its discretion.

## C. *The Pre–Judgment Interest Claim*

██ In her cross-appeal, the plaintiff also argues that the district court erred in not awarding her pre-judgment interest for the ten-month period between the jury's verdict on September 15, 1994, and the district court's entry of judgment on July 3, 1995. It appears that the district court did not award pre-judgment interest because the plaintiff only requested *post*-judgment interest—that is, interest between the date that judgment is entered and the date that the money is paid—in her post-trial submission for costs and attorneys' fees, dated September 28, 1994. The plaintiff did not request pre-judgment interest at that time because the jury had already awarded interest on the backpay claim, albeit only up to the date of its verdict, and the plaintiff had no reason to believe that the district court's judgment would be significantly delayed. However, two days later, on

---

**15.** The district court charged the jury as follows: "If defendant has satisfied its burden of production by proffering evidence tending to show a nondiscriminatory reason for the challenged action, the plaintiff must persuade you by a preponderance of the evidence that the reasons stated or articulated by the defendant for the discharge are but a mere pretext or cover up."

September 30, 1994, the defendant submitted its Rule 50(b) motion. Undoubtedly because of the severe case backlog afflicting the United States District Court for the Northern District of New York, *see* JON O. NEWMAN & STEVEN FLANDERS, UNITED STATES COURTS FOR THE SECOND CIRCUIT, SECOND CIRCUIT REPORT 1994 at 28–29 (1994) ("With only two active judges for most of the year out of five judgeships, [the Northern District] labor[ed] against heavy odds."), the district court was unable to issue its final decision and order, and enter judgment, until July 3, 1995. As a result, through no fault of the plaintiff, her claim for damages failed to request anything like the full amount that would make her "whole" as of the date of the entry of judgment. In these circumstances, the failure to explicitly request pre-judgment interest should not be deemed a waiver of the plaintiff's right to an award of such interest. *Cf. Relin,* 851 F.Supp. at 89–91 (awarding pre-judgment interest even though plaintiff failed to request it from jury).

■ Since the intention of the backpay award of Title VII is to "make persons whole for injuries suffered through past discrimination . . . [and][p]re-judgment interest, of course, is an element of complete compensation," *Loeffler v. Frank,* 486 U.S. 549, 558, 108 S.Ct. 1965, 1971, 100 L.Ed.2d 549 (1988) (internal quotation marks and citations omitted), we remand to the district court for the calculation and award of pre-judgment interest. *Sands v. Runyon,* 28 F.3d 1323, 1328 (2d Cir.1994) (finding that district court "failed to make plaintiff whole by depriving him of a clear and readily calculable measure of damages, *i.e.,* . . . [pre-judgment] interest . . . through the date of judgment").

### D. *The Attorneys' Fee Claim*

■ The defendant claims on appeal that the district court should have reduced the plaintiff's attorneys' fee award to reflect her lack of success on her voluntarily dismissed sex discrimination claims. *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 436–37, 103 S.Ct. 1933, 1939 n. 7, 1941, 76 L.Ed.2d 40 (1983) (awarding attorneys' fees for unsuccessful claims may be "excessive").[16] The question of attorneys' fees, including fees with respect to unsuccessful claims, is an issue left to the discretion of the district court. *Saulpaugh,* 4 F.3d at 145. Where the district court determines that the successful and unsuccessful claims are "inextricably intertwined" and "involve a common core of facts or [are] based on related legal theories," it is not an abuse of discretion for the court to award the entire fee. *Dominic v. Consolidated Edison Co. of New York, Inc.,* 822 F.2d 1249, 1259 (2d Cir.1987); *see also Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. The district court's finding that the instant case involved a "core of facts and related legal theories common to all the claims advanced" and its award of the entire fee request were not, in our view, an abuse of discretion.

■ The plaintiff, in turn, argues that the district court erred in reducing her fee award by the amount of the fee related solely to the fee application; she contends that the time spent on the fee application is also compensable. The district court simply stated that "plaintiff's attorney is not entitled to compensation for time expended in preparing a motion for attorneys' fees because such time is expended for the benefit of the attorney rather than the client." However, in *Gagne v. Maher,* 594 F.2d 336, 344 (2d Cir.1979), *aff'd on other grounds,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), we held that attorneys' fees for the preparation of the fee application are compensable because

---

**16.** Both *Hensley* and *Gagne v. Maher,* 594 F.2d 336 (2d Cir.1979), *aff'd on other grounds,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), concern awards of attorneys' fees under the Civil Rights Attorney's Fees Awards Act of 1976 (42 U.S.C. § 1988). However, their reasoning applies equally well to attorneys' fees under Title VII (42 U.S.C. § 2000e–5(k)). The Supreme Court in *Hensley* explicitly stated that "[t]he standards set forth in this opinion are generally applicable to all cases in which Congress has authorized an award of fees to a 'prevailing party.'" *Hensley,* 461 U.S. at 433, n. 7, 103 S.Ct. at 1939, n. 7. We have held that the "[Title VII attorneys' fees] provision is to be construed in the same fashion as all other 'prevailing party' fee provisions in federal civil rights laws, and opinions regarding fees in cases decided under sections 1983 and 1988 therefore are authoritative in the Title VII context." *Lyte v. Sara Lee Corp.,* 950 F.2d 101, 103 (2d. Cir.1991).

"[i]f an attorney is required to expend time litigating his fee claim, yet may not be compensated for that time, the attorney's effective rate for all the hours expended on the case will be correspondingly decreased. . . . Such a result would not comport with the purpose behind most statutory fee authorizations, *viz,* the encouragement of attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies."

*Id.* (quoting *Prandini v. National Tea Co.,* 585 F.2d 47, 53 (3d Cir.1978)); *see also New York State Ass'n for Retarded Children v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983). Accordingly, we reverse the district court's order denying the plaintiff an award of attorneys' fees for the time incurred in litigating the fee claim.

### III. Conclusion

To summarize:

(1) Our review of the evidence in the record persuades us that there was sufficient evidence from which the jury could rationally conclude that the plaintiff was discharged because she had complained about sexually offensive comments made to her by co-workers. We therefore affirm the district court's order denying the defendant's Rule 50(b) motion for judgment as a matter of law on the plaintiff's retaliation claim.

(2) The order granting seven weeks of front pay to the plaintiff is affirmed.

(3) The district court is directed on remand to calculate and award pre-judgment interest.

(4) The order awarding attorneys' fees is affirmed, except as noted in "5" below.

(5) The order reducing the award of attorneys' fees incurred in litigating the fee application is reversed.

(6) The cause is remanded for the sole purpose of re-computation of the attorneys' fees and the award of pre-judgment interest, both in a manner consistent with this opinion.

JACOBS, Circuit Judge, dissenting:

As the majority opinion states, a prima facie case of retaliation requires a showing, *inter alia,* "that the employee was engaged in protected activity," *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988) (citations omitted); but the plaintiff need not establish that the conduct she opposed was in fact a violation of Title VII. *Id.* It is enough, under our precedent, that Reed had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. *Id.; see also Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990).

It is uncontested that Reed had a good faith belief, at the time of her complaint, that she was the victim of a hostile work environment. I respectfully dissent from so much of the majority's ruling as concludes, on this record, that that belief was a reasonable one.

Reed, Infantino, and Lumley had been working as a team to secure a client that Reed had initially brought to the firm. Late one afternoon, the team realized that a presentation they had made to the client required an addendum on a rush basis. The team members agreed to work on it overnight and discuss it early the next morning. When Reed and Infantino spoke the following morning, Infantino informed her: "I have it all done, I will fax it to you, you can type it up and mail it out." Reed was "irritated" because, while Infantino had been preparing the addendum all night, Reed had been "working late *thinking* about what did I want in the addendum," and had therefore "wasted [her] time." (emphasis added). Reed was so irritated that she did *not* say, "gee Chuck, thanks for working all night to help land a client for my branch office, and for assuring that I send out the material from my branch under my name so that I keep primary contact with the potential client." Instead, she said: "jeez Chuck, like the good little secretary, I will type it up." This statement provoked Infantino to say: "if you think my pecker is getting in the way—," at which point Reed hung up the phone. Later that morning, Infantino apologized. Reed testified that she found his language to be "offensive" and "inappropriate."

I disagree with the majority's view that Infantino sparked the confrontation with Reed. The first volley in this hostile exchange was hurled by Reed, and it was she who introduced gender roles into a business conversation. Infantino, who had worked

late to help develop business that Reed had originated, responded with hostility, but the substance of his response was an emphatic demand that sex and gender not intrude upon their professional relationship. Infantino's response was somewhat crude, but not lubricious or in the nature of a proposition. Moreover, the statement itself consisted of a conditional clause that was never completed by a main clause because Reed hung up the phone. Infantino could have ended the sentence by saying, "... let's disregard the gender stuff, and focus on getting a client."

I therefore agree with the majority that the plaintiff "likely would not have passed the 'good faith reasonable[ness] test' of *Manoharan* if the only evidence offered at trial had been Infantino's isolated comment." Maj. Op. at 1179. The majority then turns to other evidence in the record and concludes that Reed "could reasonably have perceived Infantino's comment as merely the last in a series of incidents that led her to believe that she was the victim of a hostile work environment." *Id.* at 1180. Specifically, they cite: (1) Reed's trial testimony that Lumley "once told me I was acting like a bitch in heat and he was just not happy working with me;" and (2) evidence suggesting that even before the incident with Infantino, plaintiff "felt she was not getting the proper credit for what she does and felt [that] being a female she wasn't as appreciated."

In my view, reliance on this evidence is error. This is a retaliation case. The objective of Title VII's retaliation provision is "obviously to forbid an employer from retaliating against an employee *because of the latter's opposition to an unlawful employment practice.*" *Manoharan,* 842 F.2d at 593 (emphasis added). Thus, the only relevant conduct in evaluating whether plaintiff has suffered retaliation is the conduct that she opposed and challenged in her complaint to her employer. *See id.* at 592 (referring to opposed conduct and challenged actions). The basis of Reed's retaliation claim is the complaint she made to Rita Harfield, which did not concern Lumley. Reed testified that when she met with Harfield:

> I told her about [Infantino's] comment, but I also expressed to her my frustration in dealing—... I said, you know, this tension is continuing, Chuck [Infantino] is really

aggressive, he is really being pushy with me. And the other day he used this phrase and I thought like why is he referring to his body parts, I don't want to hear that at work. I just think it was inappropriate.

In the absence of any record evidence that Reed ever opposed or made her employer aware of Lumley's ugly statement, it cannot serve as a basis for Reed's retaliation claim.

The record does (elsewhere) show that Reed complained to Harfield and therefore to her employer that, "being a female," she received insufficient credit and appreciation. But this grievance, generalized as to names and occasions, does not begin to describe a hostile work environment, and is an insufficient makeweight. The conduct Reed complained about was that Infantino was an "aggressive" individual who made a single inappropriate remark. That comment stands alone, and does not pass the good faith reasonableness test of *Manoharan.*

I would reverse the district court's order denying the defendant's Rule 50(b) motion for judgment as a matter of law on Reed's retaliation claim.