Lorri GALARZA, Plaintiff,

v.

AMERICAN HOME ASSURANCE
COMPANY, Defendant.

No. 98CV7995(ILG).

United States District Court,
E.D. New York.

May 5, 2000.

Thomas F. Bello, Staten Island, NY, for
Plaintiff.

Marc Edward Bernstein, New York
City, P. Kevin Connelly, Karen J. Moss,
Connelly Sheehan Moran, Chicago, IL, for
Defendants.

*MEMORANDUM & ORDER*

GLASSER, District Judge.

Lorri Galarza filed this complaint against her employer, American Home Assurance Company ("AHAC"), alleging that it subjected her to workplace sexual harassment and to retaliatory discharge, in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq., and the New York Executive Law § 296 et seq. AHAC now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, AHAC's motion is granted.

## BACKGROUND

In August, 1997, plaintiff began work as a receptionist at Jacobowitz, Garfinkel and Lessman ("JGL"), which is staff counsel to, and a division of, defendant employer AHAC. (Galarza Dep. at 18; Def. Exh. A; Mason Dep. at 19; Def. Exh. C.) Galarza's supervisors at JGL were Lorraine Schwartz (the JGL clerical staff manager), Janet Herren (JGL's office manager), and Helene Teper (whose position at JGL is not identified in the record). (Galarza Dep. at 21–22.)

On May 29, 1998, plaintiff was terminated, following a conference with her three supervisors. (*Id.* at 32.) Plaintiff states that the reason given by Teper as grounds for her termination involved a book on her desk, kept there in violation of instructions from Schwartz. (*Id.* at 33; 191–93; Schwartz Dep. at 14, 24, Def. Exh. B.) Plaintiff acknowledges that, before being fired, she had been reprimanded by Schwartz about taking inaccurate telephone messages (Galarza Dep. at 41–43), and being "overly friendly" with people in the reception area. (*Id.* at 46–51; Fiedelman Aff. at ¶ 3; Def. Exh. F). She concedes that on one occasion in early May, 1998, she was audibly laughing while answering a call for Ed Garfinkel, a manager at JGL, from Tom Tizzio, an executive with JGL's parent company. (Galarza Dep. at 91–94; Mattiello Dep. at 81–84, Def. Exh. E.) She also admits that she "bounced" that call back and forth with another receptionist while continuing to laugh. (Galarza Dep. at 91–94.) Angered by this behavior, Garfinkel reprimanded plaintiff, and also reported the incident to Schwartz. (*Id.;* Schwartz Dep. at 17.) For her part, Schwartz also complains that plaintiff was in the habit of tying up firm telephone lines with her personal calls, eating at her desk, and doing personal business at her desk, all in violation of express instructions and admonitions to refrain from such conduct. (*Id.* at 14–16.)

Ten days after being hired, plaintiff signed a written warning composed by Schwartz, acknowledging that she had arrived late at the office four times, and returned late from lunch twice. (Galarza Dep., at Exh. 2.) Plaintiff does not dispute that she was late arriving to work or returning from lunch at least 16 times between January and May of 1998. (*Id.* at 82–90, Exh. 3.) During this period she also called in sick seven times. (*Id.* at Exh. 3.) According to Schwartz, plaintiff was warned several times about her poor attendance and chronic lateness. (Schwartz Dep. at 11–13.)

Plaintiff does not dispute that JGL maintained certain policies regarding the conduct of receptionists. According to Carolyn Mattiello, a receptionist with 10 years tenure at JGL, reading, eating, and taking or initiating non-emergency personal calls were all specifically prohibited to receptionists while on duty. (Mattiello Dep. at 84, 94–96, 98–99.) These rules, as well as the general requirement of punctuality, were reiterated and re-emphasized at a meeting of the secretarial and receptionist staff at JGL, including plaintiff, held on May 12, 1998, and presided over by Schwartz, Teper, and Herren. (*Id.* at 94–96; Galarza Dep. at 145–46.)

On May 5, 1998, shortly after the incident involving the phone call to Garfinkel, plaintiff received a second written reprimand from Schwartz, setting forth a de-

tailed record of deficiencies in plaintiff's job performance, and Schwartz's attempts to call them to plaintiff's attention. (Galarza Dep. at Exh. 4.) The May 5 letter specifically cites the Garfinkel call, as well as incidents in which plaintiff failed to answer the phone while on personal calls, took incomplete or inaccurate messages, and was late either arriving to work, or returning from lunch. (*Id.*) Plaintiff refused to sign the letter, for the reason that "most of this was not true." (*Id.* at 105.)

Distressed by the letter, plaintiff sought a consultation with Kevin Morris, a human resources officer at JGL. (*Id.* at 109.) In the course of a brief face-to-face meeting, plaintiff told Morris that she believed she was being treated unfairly by Schwartz. (*Id.* at 112.) She also mentioned to Morris that she was being sexually harassed by a JGL employee named Marc Kaplan, but declined to expand on that allegation, and left the interview abruptly. (*Id.* at 112, 120.)[1]

Plaintiff claims that she also told Morris that she had already complained to Schwartz about being harassed by Kaplan, but that Schwartz had done nothing about it. (*Id.* at 112, 116, 185–86.)[2] In response, Schwartz testifies that plaintiff never made such a complaint to her, and that the first she heard about plaintiff's allegations of sexual harassment was after plaintiff's termination. (Schwartz Dep. at 19.)

After his meeting with plaintiff, Morris called Valerie Mason, his supervisor in Human Resources at JGL, and reported that plaintiff had made an unspecific allegation of sexual harassment to him. (Mason Dep. at 19–20; Def. Exh. C.) It is undisputed that Mason then made two separate appointments with plaintiff, with the intention of learning more about those allega-

tions, but that plaintiff canceled both times. (*Id.* at 20–22.) When Mason attempted a third time to meet with plaintiff, plaintiff responded that she would not attend such a meeting without her attorney present. (*Id.* at 22–23; Galarza Dep. at 136–40.) Mason told plaintiff that she would not consent to that condition, and before any further investigation could take place, plaintiff had been fired. (Mason Dep. at 23.)

At the time of plaintiff's employment with AHAC, Marc Kaplan worked as a computer technician for the company, and one of his duties was to assist other employees with computer-related difficulties. (Galarza Dep. at 214–15; Mattiello Dep. at 12–14.) There is no allegation that he had supervisory authority over plaintiff. Plaintiff alleges several specific incidents of inappropriate conduct by Kaplan:

1.  November 1997: Kaplan made several calls on flimsy pretexts, which he prefaced with greetings that included the words "Hi, sexy." (Galarza Dep. at 159–60.)

2.  December 1997 or January 1998: Kaplan picked up a lingerie catalog that happened to be lying on plaintiff's desk, and leafed through it while making comments, including a statement that he would enjoy seeing plaintiff in one of the outfits, and a request that she model it for him. (*Id.* at 148, 155.)

3.  January or February 1998: While plaintiff was discussing the model Christie Brinkley with Mattiello in Kaplan's presence, Kaplan interrupted to say that he liked Brinkley, but would prefer "to be with a girl like" plaintiff. (*Id.* at 150.)

4.  January or February 1998: After overhearing a telephone conversa-

---

1.  Morris testified at an New York State Unemployment Insurance hearing that plaintiff did mention being sexually harassed in the course of his interview with her, but declined to say by whom. (Hearing Tr. at 74, Pl. Exh. A.)

2.  Plaintiff claims that her conversation with Schwartz about Kaplan's harassment took place "probably [in] the middle of April [1998]." (Galarza Dep. at 116.)

tion in which plaintiff was arguing with her fiancé, Kaplan remarked to plaintiff that "[i]f you are having problems with your husband, I am always available." (*Id.* at 174–76.)

5. March, 1998: Kaplan accosted plaintiff and Mattiello with the following unsolicited observation: "I was thinking that Carolyn [Mattiello], you are definitely wild and crazy in bed and Lorri [Galarza], you want the guy to be the aggressor in bed." (*Id.* at 165–66.)

6. March 1998: Kaplan saw plaintiff wearing a black suit and with purple camisole, and said: "I can't believe you are wearing that blouse. I can picture you in bed in that blouse ... today I really can't handle looking at you. Now I have to go upstairs and relieve myself." (*Id.* at 163–64.)

7. April 1998: Upon overhearing plaintiff and Mattiello discussing diets, Kaplan told plaintiff that "you don't have to lose weight. You are crazy ... you have a great body, especially when you wear [a particular outfit plaintiff could not specifically recall]."

Plaintiff also generally alleges that, at least half of the time he would see her, Kaplan would "look her up and down." (*Id.* at 177–78.)

AHAC has a written policy concerning sexual harassment, which it distributes to its employees as part of an "Employee Handbook." (Mattiello Dep., Exh. 1.) The policy states, in part, that

[a]ny employee who believes he or she has been the subject of sexual harassment should report it immediately to the Human Resources Department. A prompt and thorough investigation of all complaints will be undertaken. If, after an appropriate investigation, any employee is found to have sexually ha-

rassed another employee, he/she will be subject to the appropriate disciplinary action.

(*Id.* at 18.)

In October, 1998, a hearing was held before an administrative law judge of the State of New York to determine issues raised by plaintiff's claim for unemployment benefits.[3] In the course of the October hearing, Schwartz testified that the incident precipitating plaintiff's termination had involved plaintiff's insubordination in continuing to read a book while on duty at the receptionist's desk, after being ordered by Schwartz to stop reading. (Hearing Tr. at 29–32; Pl. Exh. A.) Schwartz also testified that earlier that day plaintiff had allowed a phone to ring repeatedly while she was talking with a coworker, and that the day before Schwartz had found plaintiff eating at her desk, in violation of rules governing receptionist conduct. (*Id.* at 32–34.)

At that hearing, plaintiff also testified. In the course of her testimony she stated that "[a]bout three weeks" before being fired, she filed a complaint with the Equal Employment Opportunity Commission. (*Id.* at 54, 61.) She also repeats allegations made in her deposition testimony that at some time she cannot specifically recall, but prior to her interview with Morris, she told Schwartz about Kaplan's harassment of her, and was advised by Schwartz to "ignore it." (*Id.* at 67–68.) Schwartz's response to this testimony, which was evidently given in her presence, was that plaintiff had indeed consulted her about a problem she was having with Kaplan, but that the problem concerned computer files, and no mention had been made about incidents of sexual harassment. (*Id.* at 69–72.)

### DISCUSSION

Summary judgment under Rule 56 is proper "if the pleadings, depositions, an-

---

**3.** According to the unsworn averment of plaintiff's attorney, the outcome of those proceedings was a determination that plaintiff was eligible to receive benefits, although the record contains no decision by the ALJ setting forth findings of fact or conclusions of law. (Pl. Mem. of Law in Opp. at 11.)

swers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proof on such motion. *See United States v. All Funds,* 832 F.Supp. 542, 550–51 (E.D.N.Y.1993).

If the summary judgment movant satisfies its initial burden of production, the burden of proof shifts to the nonmovant who must demonstrate that a genuine issue of fact exists for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a jury could return a verdict in its favor. *Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admission on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Once the nonmovant has adduced evidence of a genuine issue of material fact, its "allegations [will be] taken as true, and [it] will receive the benefit of the doubt when [its] assertions conflict with those of the movant." *Samuels v. Mockry,* 77 F.3d 34, 36 (2d Cir.1996).

In employment discrimination cases, courts are particularly cautious about granting summary judgment where intent is at issue. *See Schwapp v. Town of Avon,* 118 F.3d 106, 109 (2d Cir.1997). However, even in these cases a "plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Id.*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...." § 42 U.S.C.2000e–2(a). One form of gender discrimination prohibited by Title VII is sexual harassment that results in a "hostile or abusive work environment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To prevail on such a claim, "the plaintiff must demonstrate, inter alia, that the gender-based conduct complained of was sufficiently severe or pervasive to create a hostile environment." *Galdieri–Ambrosini v. Nat'l Realty & Development,* 136 F.3d 276, 289 (2d Cir.1998).

In a series of decisions, *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court set forth the allocation of burdens and orders of presentation in a Title VII case. First, "the plaintiff has the burden of proving by a preponderance of evidence a prima facie case of discrimination." *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089. Second, "if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse employment decision]." *Id.* at 253, 101 S.Ct. 1089. Third, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule and insult, that is 'sufficiently severe to alter

the conditions of the victim's employment.'" *Torres v. Pisano,* 116 F.3d 625, 630–31 (2d Cir.1997) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "Conduct that is 'merely offensive' and 'not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.'" *Torres,* 116 F.3d at 629 (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. 367).

"When a 'co-employee'—as distinct from a supervisor—is alleged to have engaged in harassing activity, the 'employer will generally not be liable unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.'" *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir.1998) (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995)); *see also Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2d Cir.1992) ("In addition to establishing that she was subjected to a hostile employment environment, plaintiff must establish that the conduct which created the hostile situation should be imputed to the employer.").

■ Applying these principles to the facts presented in this case, the conclusion is inescapable that plaintiff has failed to raise any factual issue concerning whether Kaplan's conduct should be imputed to her employer. There is *no dispute concerning* Kaplan's status—he was one of plaintiff's co-workers, with no supervisory authority over her. Nor is there any material dispute concerning the time at which plaintiff reported Kaplan's conduct to someone at AHAC with supervisory authority. She certainly made such a report on May 5, 1998, and she may have attempted to do so slightly earlier, although her testimony to that effect is vague, and strains credibility even here, where she is to be accorded all reasonable benefit of the doubt. In any

event, it is also not disputed (1) that AHAC had a reasonable complaint procedure for dealing with complaints of sexual harassment, and (2) that, through personnel officers Val Mason and Kevin Morris, AHAC made diligent efforts to investigate plaintiff's unspecific allegations of harassment. The record shows that three times within days of raising the issue with Morris, plaintiff was contacted by Mason or her assistant, attempting to arrange a meeting with plaintiff for the purpose of further discussing the allegations. Twice plaintiff canceled, and the third time told Mason that she did not wish to speak with Mason without her attorney present. There is nothing in the record suggesting why, precisely, Mason was reluctant to agree to this condition, but her reluctance is certainly not unreasonable on its face. The issue became moot a few days later when plaintiff was fired.[4] But, leaving aside the retaliation claim for the moment, this Court is driven to conclude on the record as it stands that there is no material issue raised as to whether AHAC provided a reasonable avenue to plaintiff for airing her complaints about Kaplan's conduct, or whether AHAC knew of that conduct, but did nothing about it. In fact, the record shows conclusively that AHAC did provide a reasonable avenue of complaint to plaintiff, and that, far from doing nothing, AHAC made diligent efforts to enable plaintiff to avail herself of that avenue as soon as it learned of her complaint. Accordingly, it must be concluded that Kaplan's conduct—even on the assumption that it was sufficiently severe or pervasive to rise to the level of actionable sexual harassment—may not fairly or lawfully be imputed to AHAC for the purpose of determining liability under Title VII.

Under Title VII, it is unlawful for an employer to discriminate against an employee "because he opposed any practice made an unlawful employment practice by this subchapter, or because he has made a

---

**4.** The proximity of that event to the first airing of sexual harassment allegations is ad-

dressed below, in the evaluation of plaintiff's claim of retaliatory discharge.

charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (1994). "Retaliatory discharge in violation of Title VII occurs when a retaliatory motive plays a part in the discharge, whether or not it was the sole cause or when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist." *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996) (internal quotations omitted). The *McDonnell Douglas* burden-shifting analysis set forth above applies to retaliation claims under Title VII. *Id.* Thus, on a motion for summary judgment, (1) plaintiff must demonstrate a *prima facie* case of retaliation, (2) defendant then has the burden of pointing to evidence that there was a legitimate, nonretaliatory reason for the complained of action, and (3), if the defendant meets its burden, plaintiff must demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation. *Quinn v. Green Tree Credit Corp.,* 159 F.3d at 764 n. 5; *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998).

To make out a *prima facie* case of retaliation, plaintiff must show: (1) participation in a protected activity; (2) the employer was aware of the protected activity; (3) an employment action disadvantaging the plaintiff, and (4) a causal connection between the protected activity and the adverse employment action. *Quinn,* 159 F.3d at 768; *Gallagher,* 139 F.3d at 349. Plaintiff claims that she was fired because she had complained to Schwartz and Morris about Kaplan's harassment.[5]

■ Defendant submits that there is no evidence in the record that plaintiff was engaged in a "protected activity," because plaintiff refused to cooperate with AHAC's attempts to investigate her general allegations of harassment. But defendant's construction of what counts as "protected activity" is too narrow. Title VII's prohibition of retaliation extends not just to formal charges of discrimination, but also to "informal protests, including making complaints to management ...." *Sumner v. U.S. Postal Service,* 899 F.2d 203, 209 (2d Cir.1990). Plaintiff did at least make a complaint to management, which, although vague and unspecific, was enough to prompt a responsive investigation.

■ There is no issue concerning the second and third factors of the *prima facie* inquiry—AHAC was aware of plaintiff's complaint, and plaintiff was fired. But defendant argues that plaintiff cannot make a *prima facie* showing that she was fired because of her complaints of harassment. Again, however, the law of this Circuit appears to hold to the contrary: where plaintiff's discharge comes within a mere few weeks of her filing a complaint, a *prima facie* showing of a causal connection between the protected activity and the adverse employment action is made. *Quinn v. Green Tree Credit Corp.,* 159 F.3d at 769; *see also Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988) ("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").

■ This is to say that plaintiff does make a *prima facie* case of retaliatory discharge actionable under Title VII. Where plaintiff's claim falters is in the *McDonnell Douglas* burden-shifting analysis. Defendant has adduced abundant evidence of legitimate, nondiscriminatory reasons why plaintiff was fired when she was. And this evidence has not been countered in the record with evidence showing that these reasons are pretextual.

**5.** She implicitly also raises a claim that she was fired because she had filed a complaint against AHAC with the EEOC concerning Kaplan's conduct, but there is no specific information in the record about the timing of that complaint.

Plaintiff was warned within days of being hired in August, 1997 about being late to work or back from lunch. Nevertheless, it is not disputed that she was late to work or back from lunch no fewer than 16 times between January and May of 1998. Early in May, 1998, she was given a written warning citing her for various deficiencies in job performance, including the Garfinkel call, as well as incidents in which plaintiff failed to answer the phone while on personal calls, took incomplete or inaccurate messages, and was late. Plaintiff specifically disputes nothing set forth in that letter, and indeed, specifically concedes defendant's allegations concerning the Garfinkel incident, as well as the punctuality problems. Finally, although plaintiff offers a slightly different version of the incident that precipitated her firing, involving unauthorized reading while on duty, she does not dispute that she was indeed displaying reading material in the vicinity of her desk after having been warned repeatedly not to. (Hearing Tr. at 53, Pl. Exh. A.) Of course, plaintiff's protest that something so trivial as unauthorized reading suffices to raise an issue as to whether her firing was pretextual must ring on deaf ears. Plaintiff was not fired for reading; she was fired because she had chafed under and defied the simple regime her employer had made a condition of her employment as a receptionist. It was not necessarily the most pleasant regime an employee might imagine. But, "Title VII is not directed against unpleasantness[; it is directed] ... against discrimination in the conditions of employment." *Carr v. Allison Gas Turbine Div.*, 32 F.3d 1007, 1009 (7th Cir.1994). Here, plaintiff has failed to raise an issue concerning whether she was fired for complaining about sexual harassment, because the record is replete with evidence that she was in fact fired for the simple reason that her performance was substandard. Accordingly, her Title VII retaliation claim must fail.

■ Finally, because claims of sexual harassment and retaliatory discharge brought under the New York Executive Law are analytically indistinguishable from their Title VII equivalents, summary judgment is appropriate in favor of the defendant on the former, for the reasons set forth with respect to the latter. *Reed v. A.W. Lawrence & Co.*, 95 F.3d at 1177.

### CONCLUSION

For the reasons set forth, defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted in its entirety.

SO ORDERED.