Catherine **RUGGIERI**, Plaintiff,

v.

**Donald J. HARRINGTON, individually and in his capacity as President of St. John's University, and St. John's University, Defendants.**

**No. 98 CV 5210 (CBA).**

United States District Court, E.D. New York.

March 30, 2001.

Steven A. Rosen, Steven A. Rosen, Attorney at Law, New York City, for plaintiff.

Ruth D. Raisfeld, Orrick, Herrington & Sutcliffe, L.L.P., New York City, for defendants.

## MEMORANDUM AND ORDER

AMON, District Judge.

Plaintiff Catherine Ruggieri, a tenured professor at St. John's University ("St. John's" or the "University"), brought this action against defendants St. John's and Father Donald J. Harrington, the President of St. John's, alleging a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and various state law claims. Specifically, Ruggieri alleges

that she was retaliated against for filing a previous discrimination lawsuit against St. John's in 1993.[1] Defendants counterclaimed for breach of the agreement the parties entered into in settlement of that earlier case. Before the Court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 on all claims. For the reasons set forth below, the Court grants defendants' motion for summary judgment on plaintiff's claims but denies the motion as to defendants' counterclaim.

### Background

The following undisputed facts are taken from plaintiff's Amended Complaint, plaintiff's and defendants' Rule 56.1 Statements, and relevant affidavits, exhibits, and deposition testimony.

Plaintiff Ruggieri is a tenured professor of Administration and Economics at St. Vincent's College, an undergraduate college at St. John's. St. Vincent's, now known as the College of Professional Studies, has two campuses, one in Queens and the other in Staten Island. Defendant Harrington has been the President of St. John's since August 1989.

From 1981 until her removal by Harrington on June 10, 1993, Ruggieri was the dean of St. Vincent's. In September 1993, after previously filing a charge with the Equal Employment Opportunity Commission ("EEOC"), Ruggieri brought a Title VII case here, *Ruggieri v. Harrington,* 93 CV 4371 (E.D.N.Y.), challenging her removal as dean. This Court dismissed that case in 1995 pursuant to a Settlement Agreement, Release and Covenant Not to Sue (the "Settlement Agreement"), dated

---

1. Plaintiff's complaint, filed on August 14, 1998, and her amended complaint, filed on February 11, 1999, stated claims for retaliation and sex discrimination pursuant to Title VII, the New York State Human Rights Law, and the New York City Human Rights Law, and also claims for breach of contract and intentional infliction of emotional distress. Plaintiff withdrew her sex discrimination claims on March 23, 2000.

January 30, 1995 and a Memorandum of Agreement (the "Memorandum Agreement"), dated February 9, 1995 (collectively, the "Settlement Agreements").

Under the terms of the Settlement Agreements, St. John's agreed, *inter alia*, to provide Ruggieri with a lump sum payment, a two-semester paid leave of absence, and a "private office" on either of St. Vincent's two campuses; to appoint her to a search committee for the position of college dean or higher; and to make a public announcement that she would receive the honorary title of "Dean Emeritus" on the 25th anniversary of her employment by the University.

For her part, Ruggieri waived her right to reinstatement to her former position as dean of St. Vincent's and agreed not to apply for "any administrative position" in the future. More specifically, paragraph 5 of the Settlement Agreement provides, in relevant part:

RUGGIERI further covenants not to apply for, pursue or accept employment in any administrative position with ST. JOHN'S for a period of five (5) years after the date of her execution of this AGREEMENT, or for so long as HARRINGTON is President of ST. JOHN'S whichever period is longer.... RUGGIERI further covenants that ST. JOHN'S and HARRINGTON or his successors have no obligation to consider RUGGIERI as a candidate for employment in any administrative position during said period. In the event that any such application is made contrary to the terms of this paragraph, RUGGIERI shall, upon request by ST. JOHN's immediately withdraw such application and have no further recourse against ST. JOHN'S and HARRINGTON or his successors regarding said application.

(Affidavit of Ruth D. Raisfeld ("Raisfeld Aff."), sworn to March 2, 2000, Ex. 27 ¶ 5.)

Notwithstanding the other terms of the Settlement Agreement, paragraph 23 provides that:

Ruggieri's rights as a tenured faculty member, including rights pursuant to the terms of the University Statutes, the collective bargaining agreement, and any retirement, savings, or other benefit plans of ST. JOHN's, are independent of this agreement and are not affected or waived by this AGREEMENT.

(*Id.* ¶ 23.) The University By-laws, also known as the "University Statutes," are adopted by St. John's Board of Trustees. The University Statutes are adopted or incorporated by reference in the collective bargaining agreement to which the University and the faculty labor unions are parties.

The Settlement Agreements additionally contain confidentiality provisions that limit the individuals at St. John's who could be privy to the terms of the agreements. Dr. Kathleen MacDonald, who in June 1994 replaced Ruggieri as dean of St. Vincent's, is not authorized to have any knowledge of the agreements and has never read the agreements. Prior to her hiring as dean of St. Vincent's, MacDonald was the dean of Polytechnic University's Westchester campus. At Ruggieri's request, Dr. Tony Bonaparte, the provost of St. John's, was designated to be the administrator of the Settlement Agreements, the University representative with whom she was to confer concerning any matters relating to the agreements.

Ruggieri's claims in the instant lawsuit are apparently based on eleven separate incidents:

*The Temporary Denial of Ruggieri's Requested Teaching Reduction*

In the spring of 1994, Ruggieri applied to, and was accepted by, Brooklyn Law School's evening division. At that time,

she submitted a request to Dr. Carmine Gibaldi, who was then the chair of Ruggieri's academic department, the Division of Administration and Economics, requesting a paid, two-course (six-credit) reduction in her teaching schedule for the Fall 1994 and Spring 1995 semesters so that she could pursue her legal studies. Based upon Gibaldi's recommendation, Dr. Andre McKenzie, who served as acting dean of St. Vincent's from June 1993 to June 1994, approved Ruggieri's requested teaching reduction.

Subsequently, at a September 5, 1995 Faculty Council attended by Ruggieri, Dean MacDonald, who had since succeeded McKenzie, announced a new University policy pursuant to which requests for paid course reductions for graduate study would no longer be granted, regardless of whether such reductions had been granted in the past. Ruggieri thereafter wrote MacDonald asking that her two-course teaching reduction nevertheless be continued for the Spring 1996 semester. MacDonald denied the request, citing the new policy.

Ruggieri then wrote Provost Bonaparte on October 6, 1995, stating that she believed the denial of the reduction constituted a violation of the Settlement Agreement she had entered into with the University in resolution of her prior discrimination lawsuit. Bonaparte responded on November 8, 1995, that he did not believe Ruggieri was entitled to the reduction pursuant to the Settlement Agreement. After Ruggieri filed a grievance with the faculty union (not based on a theory of retaliation), Bonaparte reinstated Ruggieri's teaching reduction for the remaining two and a half years of her law school studies

on November 29, 1995, but noted that "there is absolutely no basis, in the Settlement Agreement or the Collective Bargaining Agreement, for granting a reduction in your teaching load." (Raisfeld Aff., Ex. 43.)

*The Appointment of Dr. Anthony Gabb as Department Chair*

In February 1995, the Division of Administration and Economics conducted an election for department chair. Pursuant to the procedures prescribed in the University Statutes, the Provost's Office distributed an initial list of eligible faculty in the department, meaning associate or full professors with tenure. Among others, Ruggieri withdrew her name from consideration for chair. In the secret ballot departmental election, Gibaldi, the then-current chair, received sixteen votes. Professor Joyce Boland–DeVito received one vote. Presented with the election results, Dean MacDonald recommended to Provost Bonaparte in April 1995 that Boland–DeVito be appointed acting chair for one year.[2]

Bonaparte then held a meeting with the department's faculty and requested that they submit the names of other faculty members that they believed to be qualified to serve as chair, other than Gibaldi and Boland–Devito. The only two professors named were Dr. Anthony Gabb and Professor Theodore Muzio. MacDonald and Bonaparte ultimately recommended to President Harrington in June 1995 that Gabb be appointed acting chair for one year, and Harrington approved the recommendation.

As Gabb's appointment was to expire in June 1996, the Division of Administration

2. Under the procedures established in the University Statutes, the college dean and the provost are to confer and present their recommendations regarding department chairs to the president. The University's Board of Trustees makes the ultimate appointments based on the president's recommendations.

and Economics held another election for department chair in February 1996. After the Provost's Office distributed the initial list of eligible faculty members, only two members of the department did not withdraw their names ,from consideration— Gabb and Ruggieri. In the faculty election, Ruggieri received nine votes and Gabb received two votes. Despite the vote, on March 19, 1996, MacDonald recommended to Bonaparte that Gabb be appointed chair of the department, stating that she supported Gabb because she had worked closely with him during his term as acting chair and was confident in his ability due to his strong academic credentials and management skills.

On April 9, 1996, Bonaparte wrote Ruggieri, asking her to withdraw her name from consideration as chair pursuant to paragraph 5 of the Settlement Agreement, which barred her from seeking "any administrative position." Ruggieri responded on April 17, 1996, stating that she disagreed with Bonaparte's interpretation of the Settlement Agreement and declining to withdraw her name. On April 25, 1996, Bonaparte recommended to Harrington that Gabb be named chair of the Division of Administration and Economics. Harrington accepted the recommendation and forwarded it to the Board of Trustees, who approved the appointment.[3]

Sometime after first learning that Ruggieri had received the majority of the votes for department chair, Harrington consulted with the University's general counsel, Herbert Schwartzmann, because he did not think she could serve as department chair under the terms of the Settlement Agreement. Harrington did not, however, have any discussions with either MacDonald or Bonaparte about whom they were going to recommend as department chair before they recommended that Gabb be appointed, and he does not recall ever seeing Bonaparte's letter to Ruggieri asking her to withdraw.

Department chairs receive a six-credit teaching reduction and a minimum annual stipend of $2,750.

*Ruggieri's Private Office*

As required by the Memorandum Agreement, the University constructed a private office for Ruggieri on the Staten Island campus of St. Vincent's, using space that had previously served as a lounge connecting the two sides of St. Joseph's Hall. The new office thus had two doors; one that was intended to be permanently locked, and the other that served as the front entrance to the office. In September 1995, Ruggieri moved from her old office in St. Joseph's Hall, which she had shared with several other faculty members, to the new office.

On October 31, 1995, Ruggieri complained to Father James Kiernan, the senior vice president of the Staten Island campus, that individuals were walking through her office to get to the other side of the building and were using her office when she was not present on campus. Kiernan agreed to correct the problem and

---

**3.** At her deposition, Ruggieri conceded that St. John's followed the proper procedures in appointing Gabb as chair in 1996. Ruggieri now argues that "[s]ince her deposition, [she] realized that the University did not follow proper statutory procedures with respect to the department election." (Pl.'s Statement of Material Facts in Issue Pursuant to Local Rule 56.1 ¶ 105.) This allegation will be disregarded as it is well-settled in the Second Circuit that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir.1996); *accord Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995).

met with the campus' assistant director of security, William Mulvey, and the director of the maintenance department, to discuss Ruggieri's concerns.

On January 26, 1996, Ruggieri complained to Provost Bonaparte that University employees were continuing to use her office. In response, Kiernan again met with Mulvey and the director of the maintenance department to discuss Ruggieri's problems. On February 14, 1996, Bonaparte informed Ruggieri that campus security had been directed to watch her office to make sure others were not entering it and that they had replaced a broken lock on one of the doors to the office.

In response to continuing complaints from Ruggieri, Kiernan met once more with individuals from the campus' security and maintenance departments on April 3, 1996. Around that time, the security department replaced the locks on both doors of Ruggieri's office and agreed to continue to make frequent inspections of her office. Only three keys were made for the new locks; one held by the security department, one held by the maintenance department, and one held by Ruggieri herself.

Ruggieri did not complain again about unauthorized entry into her office until March 28, 1998. At that time, the security department once again changed the locks to Ruggieri's office and agreed to continue to make inspections of her office. In June 1998, the security department further implemented a log for Ruggieri's office, requiring written record of all entries into the office for cleaning or any other purpose. Since the log system was put in place, Ruggieri has not complained further about the unauthorized use of her office.

*Errors in the St. John's Directory*

In early 1995, St. John's published its first university-wide telephone directory, listing the names, titles, office locations, and telephone numbers for all of its employees. In October 1995, Ruggieri notified Father Kiernan that the directory incorrectly listed her as being a member of the "staff" rather than as a professor, and listed her former office and telephone numbers. Ruggieri had moved that September from her old office, 101 St. Joseph's Hall, to her new office in 103 St. Joseph's Hall, and was assigned a new telephone number.

Kiernan informed the University switchboard of the errors and instructed Information Technology Services to make a correction in the next publication of the directory. In a revised version of the directory published in the fall of 1995, Ruggieri was correctly listed as a full Professor of Management, but her office number and telephone number remained incorrect. The Spring 1996 and Fall 1996 versions of the directory correctly listed all of Ruggieri's information in the Queens section, but incorrectly in the Staten Island section. The incorrect listings of Ruggieri's office number and telephone number were not finally corrected in both the Queens and Staten Island sections until the Fall 1997 version of the directory.

*Late Notice of Ruggieri's Election to a Faculty Committee*

In June 1996, Ruggieri was elected to the Committee on Hearing and Deciding Charges Against a Faculty Member, a faculty committee established for the purpose of determining whether a tenured faculty member should be removed from the University for cause. Provost Bonaparte published the names of the five elected faculty members in a memorandum dated July 1, 1996 and addressed to all "Full-time Faculty," which was intended to be distributed by the department chairs. In September 1996, Ruggieri, who never received the

memorandum,[4] called the Provost's Office to inquire about the election results and was told by Elizabeth Pollicino that she had been elected to the committee. Pollicino immediately sent Ruggieri a facsimile copy of Bonaparte's July 1, 1996 memorandum.

*Late Notice of Ruggieri's Merit Award*

In 1996, Ruggieri applied for a faculty merit award. Merit awards, in the form of a $500 increase in base salary and a $500 bonus payment, are given annually to certain faculty upon approval by three separate committees, a committee within the professor's department, a college-wide committee, and a university-wide committee. According to the guidelines distributed with the application for the 1996 merit awards, the faculty would be informed by June 28, 1996 of their college committee's action and by August 16, 1996 of the university committee's action.

In mid-May of 1996, Dean MacDonald informed Ruggieri by letter that the St. Vincent's College merit committee had approved her application and that it would be sent to the university committee for consideration. On August 12, 1996, Marina Torre, a secretary in the Provost's Office, mailed a letter to Ruggieri from Provost Bonaparte informing her that she had been granted a merit award for 1996 and that her salary for the 1996–97 academic year would be increased by $500 and that she would receive a $500 bonus in January 1997. The letter was sent to Ruggieri's parents' home address, which Ruggieri had not used as her mailing address since 1994.

On August 29, 1996, Ruggieri, who never received Bonaparte's letter, called the Provost's Office to inquire about the merit award. Torre informed Ruggieri that she had been granted the award and immediately sent Ruggieri a facsimile copy of Bonaparte's letter. Ruggieri also received faculty merit awards in 1995, 1997, 1998, and 1999.

*The Changing and Cancellation of Course Assignments*

In the fall of 1996, after discussions with Gabb, who was then the chair of her department, Ruggieri believed that she would be assigned to teach three sections of Management in the spring semester of 1997. She learned in November 1996 by reading a student course registration book that instead she had been assigned to teach two Management classes and one Marketing class. Ruggieri had taught both courses in the past, was qualified to teach both courses, and had listed both courses among the preferences she had sent to Gabb earlier.

During the summer semesters of 1996 and 1997, Ruggieri was unable to teach any courses that she had wanted to teach. In 1996, the University offered a summer Marketing course that Ruggieri was scheduled to teach at the Staten Island campus, but cancelled the course before the summer semester started. As of that March, only five students had enrolled in the course. In 1997, the University did not offer any of Ruggieri's summer Marketing or Management courses at the Staten Island campus, citing a lack of enrollment in prior years. Although the University gave Ruggieri the opportunity to teach a summer course at its Queens campus in 1997, she declined.

In addition to their salary, full-time faculty members who teach summer courses

---

4. Gabb apparently distributed a memorandum in September 1996 to the members of the department, including Ruggieri, providing the results of the elections. (Raisfeld Aff., Ex. 78.) Ruggieri disputes this fact in her affidavit in opposition to defendants' summary judgment, stating that Gabb never sent such a memo.

receive an additional payment equal to ⅙₀ of their annual salary for each credit hour taught.

### The Public Announcement of Ruggieri's "Dean Emeritus" Title

Pursuant to paragraph 1 of the Memorandum Agreement, St. John's general counsel, Schwartzmann, issued a memorandum on February 14, 1995, addressed to the "University Community" and stating that:

> Catherine Ruggieri's discrimination lawsuit has been resolved to the mutual satisfaction of all parties. The University is pleased to announce that in recognition of Professor Ruggieri's contributions as Dean of St. Vincent's College, the University will confer upon her the title of "Dean Emeritus, St. Vincent's College." In accordance with University policy, this appointment will be effective upon the 25th Anniversary of her employment with the University. The parties take this opportunity to reaffirm their mutual commitment to ensure that respect and dignity are accorded to everyone at the University.

(Raisfeld Aff. Ex. 95.) The University took no further action to publicly confer, announce, or celebrate Ruggieri's "Dean Emeritus" title after the issuance of the memorandum.

### The Delay in Getting Her Parking Permit Renewed

In June 1998, Ruggieri had "difficulties" renewing her reserved parking permit on the Queens campus of St. John's. Every spring, holders of reserved parking permits for the Queens campus parking lot must renew their permits with the security office there. When Ruggieri, who had not taught at the Queens campus since 1994, went to renew her permit, she was instructed by a student employee that she had to speak to the new Assistant Director of Security, Robert McDonald. After a discussion with McDonald, who apparently questioned whether Ruggieri still taught at the Queens campus and "refused to accept" her explanation that she could be reassigned to teach there at any time, McDonald "reluctantly" renewed Ruggieri's permit. (*See* Affidavit of Catherine Ruggieri ("Ruggieri Aff."), sworn to May 12, 2000, at ¶ 91.)

### The Failure to Issue Ruggieri an Access Card

In the spring of 1998, St. John's did not issue Ruggieri a new electronic access card for the Queens campus. As a result, Ruggieri was unable to enter buildings on the Queens campus or the faculty restrooms. When the University learned in January 1999 based upon the instant litigation that Ruggieri had not received an access card, Dean MacDonald immediately issued a card to her. Ruggieri had not previously reported this problem.

### The Decision Not to Assign Ruggieri to Teach Paralegal Studies

While Ruggieri was still finishing her law degree in the spring of 1998, she asked Bernard Helldorfer, the chair of St. John's Criminal Justice and Legal Studies Department and then the Director of the Paralegal Studies Program, if she could teach a Paralegal Studies course in the fall of 1998. Ruggieri was assigned a full schedule of classes in the Fall 1998 semester, but was not assigned to teach a Paralegal Studies course. Helldorfer believed that Ruggieri was not qualified to teach a Paralegal Studies class, and in any event, all of the courses for that semester had already been assigned to other professors.

### Discussion

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, to-

gether with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999). The Court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 622 (2d Cir.1999).

Although the court is required to view the evidence in the light most favorable to the nonmoving party, *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the non-moving party cannot rest "mere allegations or denials" but must instead "set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *National Westminster Bank USA v. Ross,* 676 F.Supp. 48, 51 (S.D.N.Y.1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact.") No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Based on the undisputed facts presented in this case, and viewing the evidence in the light most favorable to the plaintiff, defendants are entitled to summary judgment on plaintiff's claims but not on their counterclaim.

## I. *Plaintiff's Claims*

### A. *Retaliation*

Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer to discriminate against any of his employees ... because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" alleging discrimination on the basis of race, color, religion, sex or national origin. 42 U.S.C. § 2000e–3(a). Likewise, the New York State Human Rights Law and the New York City Human Rights Law prohibit employers from discriminating against employees who oppose discriminatory practices. *See* N.Y. Exec. L. § 296(1)(e); N.Y.C. Admin. Code. § 8–107(7). Plaintiff's state law retaliation claims will therefore be considered together with her Title VII claims. *See, e.g., Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 (2d Cir.1996).

Retaliation cases are subject to the burden shifting framework for analyzing Title VII discriminatory treatment cases enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and clarified more recently in *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *See Reed,* 95 F.3d at 1177–78; *accord Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1038–39 (2d Cir.1993). The plaintiff must first establish a prima facie case of retaliation. *See Reeves,* 530 U.S. at 142, 120 S.Ct. 2097; *see also James v. New York Racing Assoc.,* 233 F.3d 149, 153 (2d Cir.2000). If the plaintiff has satisfied that requirement, it is presumed that the employer did retaliate against the employee, and the burden shifts to the defendant to rebut the prima facie case by introducing admissible evidence of a legitimate, nondiscriminatory

reason for its actions. *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097; *James,* 233 F.3d at 154. Once the defendant meets this burden, the presumption of discrimination "drops out of the picture." *St. Mary's,* 509 U.S. at 510–11, 113 S.Ct. 2742. The plaintiff is then left to prove that she was, in fact, the victim of retaliation. *Id.* at 508, 113 S.Ct. 2742.

In determining whether summary judgment is appropriate, the court must make a "case-by-case" determination based on a review of the entire record. *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000). An employer will be entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James,* 233 F.3d at 154. The court may consider factors including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] that employer's case . . ." *Id.* at 156 (quoting *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097) (brackets added in quotation). A plaintiff's prima facie case alone, combined with a showing that the employer's asserted justification is false, although not always sufficient, may in some instances permit a finding of discrimination. *See Reeves,* 530 U.S. at 147–48, 120 S.Ct. 2097.

### 1. Statute of Limitations

■ As an initial matter, under 42 U.S.C. § 2000e–5(e), a plaintiff's Title VII claims for retaliation are time-barred if they are not filed with the EEOC within 180 days of the alleged discriminatory actions, or 300 days if the plaintiff has already filed the charge with a state or local equal employment agency. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996). A plaintiff's state law retaliation claims, on the other hand, are subject to a three-year statute of limitations. *See id.* at 714. Although there is no evidence in this case that Ruggieri ever filed charges with a state or local authority, since defendants argue that her claims were subject to the 300–day limitation and she does not object, it will be accepted as a stipulated fact. *See id.* at 712 n. 1. Accordingly, while at the very least Ruggieri's claim regarding the cancellation of her teaching reduction in September 1995 is time-barred under Title VII since she did not file EEOC charges until February 24, 1997, the Court will in any event consider all of the conduct alleged by Ruggieri to be retaliatory in the context of her state law claims for retaliation.[5]

### 2. Jurisdiction

■ Ruggieri also alleges in her Amended Complaint four instances of retaliation that occurred in 1998, after she had filed her initial EEOC charges, and for which she never filed new EEOC charges or amended EEOC charges: (1) the University's failure to publicly announce her "Dean Emeritus" title; (2) the University's failure to provide her with a Queens campus access card; (3) the Uni-

---

**5.** Plaintiff's argument that the alleged conduct falls within the "continuous violation" exception to Title VII's statute of limitations is unconvincing. Aside from plaintiff's bare assertions to the contrary, she has presented no evidence that the conduct she complains of, which was undertaken by an admittedly disparate array of individuals, could be considered to be "accomplished through a specific official policy or mechanism." *Butts v. City*

*of New York Dep't of Housing Preservation and Dev.,* 990 F.2d 1397, 1404 (2d Cir.1993). As discussed below, plaintiff's conclusory allegations that the incidents she complains about occurred as the result of a concerted effort by President Harrington and those loyal to him because of some Catholic, or more specifically, Vincentian, notion of loyalty, are wholly unsupported and do not merit serious discussion.

versity's decision not to allow her to teach a Paralegal Studies course; and (4) the problems she had getting her Queens campus parking permit renewed. A district court only has jurisdiction to hear Title VII claims that are either made in a prior EEOC charge or are based on subsequent conduct that is "reasonably related" to the conduct alleged in EEOC charge. *Butts v. City of New York Dep't of Housing Preservation and Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993). Although it is not readily apparent that the subsequent conduct here is "reasonably related" to Ruggieri's initial allegations, giving her the benefit of the doubt that the activities might have fallen "within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of [retaliation]," the Court will include the conduct in its discussion. *Id.* at 1402.

### 3. Prima Facie Case

█ In order to establish a prima facie case of retaliation, the plaintiff must show that: (1) she was engaged in a protected activity; (2) her employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Reed,* 95 F.3d at 1178; *accord Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000). In this case, it is not disputed that Ruggieri engaged in a protected activity and that her employer was aware of that activity, as she brought a lawsuit against St. John's alleging sex discrimination that the parties ultimately settled in 1995. The sole remaining question, therefore, is whether Ruggieri can show that she suffered an adverse employment action and that there was a causal connection between the earlier discrimination lawsuit and such adverse employment action.

As the Court concludes that Ruggieri fails to establish a prima facie case, her retaliation claim fails as a matter of law. The Court therefore grants defendants' motion for summary judgment on this claim.

#### a. Adverse Employment Action

█ A plaintiff suffers an "adverse employment action" if she endures a "materially adverse change in the terms and conditions of employment." *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 446 (2d Cir.1999) (quoting *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir.1997)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.1993)); *see also Yerdon v. Henry,* 91 F.3d 370, 378 (2d Cir.1996) ("An adverse action is one that affects the terms, privileges, duration, or conditions of employment.") (quoting *Johnson v. Frank,* 828 F.Supp. 1143, 1153 (S.D.N.Y.1993)).

However, while "less flagrant reprisals by employers may indeed be adverse ... not every unpleasant matter short of discharge or demotion creates a cause of action for retaliatory discharge." *Richardson,* 180 F.3d at 446 (internal quotations and brackets omitted). It is a court's responsibility to "pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Id.* at 446 (quoting *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997)).

None of the alleged incidents of retaliation cited by Ruggieri, either individually, or considered as a whole, constitute an adverse employment action.[6] For instance, the University's failure in June 1998 to announce that Ruggieri's "Dean Emeritus" title had become effective or to hold a celebratory convocation in her honor did not result in a "materially adverse change in the terms and conditions of employment." *Richardson,* 180 F.3d at 446. Ruggieri suffered no loss of wages, benefits, responsibilities, or anything else. Quite to the contrary, pursuant to the Settlement Agreements, St. John's bestowed upon Ruggieri the honorific title "Dean Emeritus" and publicly announced to the entire University community that she would receive that title three years before she was even eligible to receive the honor. Counsel's contention at oral argument that Ruggieri lost "prestige" as a result of the University's actions is thus misguided. If anything, the University added to Ruggieri's prestige and did so three years early.

Ruggieri also cannot reasonably argue that the errors printed in the St. John's directory in any way adversely affected her employment. Apart from some students telling her that they had difficulties contacting her, and the fact that she "almost did not receive" one "important message" from Provost Bonaparte, Ruggieri does not articulate any problems that she experienced as a result of the errors in the directory. (Deposition of Catherine Ruggieri ("Ruggieri Dep."), at 475–76.) While unpleasant, such a "mere inconvenience" is simply not cognizable as an adverse employment action. *Galabya,* 202 F.3d at 640; *see also Torres,* 116 F.3d at 640 ("unspecified inconvenience" due to "relatively minor administrative miscues" does not constitute adverse employment action); *Wanamaker,* 108 F.3d at 466 ("minor, ministerial stumbling block[s]" are not "sufficiently deleterious").

Likewise, although Ruggieri claims she was "embarrassed" and "wasn't sleeping" and that her "life was literally hell" during the few months she was waiting for her fully paid two-course teaching reduction to be finally reinstated by Bonaparte during the fall of 1995, she suffered no adverse consequences. (Ruggieri Dep. at 409–10.) As the court noted in *Davis v. City Univ. of New York,* No. 94 Civ. 7277, 1996 WL 243256 (S.D.N.Y. May 9, 1996), "such inchoate matters as plaintiff's embarrassment or anxiety," while waiting for a decision (in that case, tenure) that "ultimately redounded to her benefit" is not a materially adverse change in her employment. *Id.* at *8–*9; *see also Torres,* 116 F.3d at 640 (fact that plaintiff was "frightened" and "humiliated" alone does not mean there was an adverse employment action); *Negussey v. Syracuse Univ.,* No. 95–CV–1827, 1997 WL 141679, at *10 (N.D.N.Y. Mar.27, 1997) (plaintiff's feelings of "uncertainty and anxiousness . . . [while] awaiting the result of his grievance" and "considerable turmoil and personal upheaval" did not have "a lasting

---

**6.** At oral argument, plaintiff's counsel identified the five incidents alleged to separately and independently constitute adverse employment actions: (1) the decision not to appoint Ruggieri as chair of her department; (2) the failure to publicly confer the "Dean Emeritus" title on her in 1998; (3) the decision initially to discontinue her teaching reduction; (4) the errors in the University telephone directory; and (5) the failure to provide her with a private office. The Court will therefore mainly review the other alleged incidents of retaliation in the context of plaintiff's broader hostile work environment theory. The Court will not, however, address plaintiff's allegation regarding her private office because plaintiff has conceded that she has no evidence that her problems with her office were the result of retaliation.

effect on the terms, privileges, or duration of plaintiff's employment").

The only conduct that even arguably constitutes adverse employment action is the University's decision to appoint Gabb as chair of the Division of Administration and Economics instead of Ruggieri and the cancellation of the summer courses that Ruggieri sought to teach in 1996 and 1997. In neither instance, however, can it be said that Ruggieri suffered a materially adverse change in her employment. At all times, she remained a full, tenured professor at St. John's, with no reduction in salary, benefits, or responsibilities.[7] Ruggieri simply suffered no adverse employment action as a result of being denied the occasion to serve as department chair and to teach certain summer courses that she wanted to teach, opportunities to which she was not absolutely entitled simply based on her status as a tenured professor. *Cf. Demuren v. Old Dominion Univ.,* 33 F.Supp.2d 469, 483–84 (E.D.Va.), *aff'd,* 188 F.3d 501 (4th Cir.1999) (plaintiff's exclusion from Dean Search Committee, failure to receive 1996 University Outstanding Research Award, and failure to receive Eminent Scholar status do not qualify as adverse employment actions).

■ Finally, even examining together all of the allegedly retaliatory conduct under a hostile work environment theory, Ruggieri still cannot show an adverse employment action. The Second Circuit has recently adopted the view that "unchecked retaliatory co-worker harassment, *if sufficiently severe,* may constitute adverse employment action so as to satisfy the second prong of the retaliation prima facie case."

*Richardson,* 180 F.3d at 446 (emphasis added). *Cf. Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (for hostile work environment claim, conduct must be sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and to create an objectively and subjectively abusive work environment); *Brennan v. Metropolitan Opera Assoc.,* 192 F.3d 310, 318 (2d Cir. 1999) (same). For instance, in *Richardson,* the plaintiff was the target of substantial retaliatory abuse from her co-workers, including placing manure in her parking space, putting hair in her food, shooting a rubber band at her head, and scratching her car. *Richardson,* 180 F.3d at 446–47.

■ The alleged conduct in this case, even taking the facts as alleged by Ruggieri, does not approach the standard established in *Richardson.* In total, in addition to the conduct already discussed, Ruggieri complains that she learned through the student course registration book that she had been assigned to teach two Management classes and one Marketing class in the Spring 1997 term instead of the three Management classes that she had assumed she would be teaching, she was not assigned to teach a Paralegal Studies course that she desired to teach, she had difficulties renewing her Queens campus parking permit, she was not issued a new Queens campus access card in 1998, and she received delayed notice of the University's decision to grant her a merit award in 1996 and of her election to the Committee on Hearing and Deciding Charges Against a Faculty Member. This collection of administrative mixups, minor annoyances,

---

**7.** While the failure to promote an employee might constitute an adverse employment action, *see Penny v. Winthrop–Univ. Hospital,* 883 F.Supp. 839, 845 (E.D.N.Y.1995), in this case, and as conceded by plaintiff's counsel at oral argument, the decision not to appoint Ruggieri as department chair cannot strictly be considered a failure to promote. Likewise, the cancellation of two of Ruggieri's summer courses also cannot be considered a failure to promote.

and perceived slights cannot be considered severe or pervasive harassment.[8] Retaliation laws are intended to protect employees from genuine workplace mistreatment and harassment; they are not intended to guarantee that employees will never suffer inconveniences or that their every desire will be fulfilled.

### b. *Causal Connection*

■ Even assuming *arguendo* that the University's refusal to appoint Ruggieri as chair of her department or the cancellation of her summer term courses in 1996 and 1997 could be considered adverse employment actions, because she was consequentially denied additional wages and benefits (above and beyond what she already received as a full professor), she cannot show a causal connection between her filing the previous EEOC charges and lawsuit and such actions. A causal connection "can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus." *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990); *accord Cosgrove,* 9 F.3d at 1039.

Ruggieri's assertions in this case that the various instances of retaliation she complains about occurred because University President Harrington had been troubled by the publicity resulting from her earlier discrimination lawsuit and decided to "single[ ] [her] out for a campaign of

harassing humiliating mistreatment" are wholly unsubstantiated. (Pl.'s Opp. Mem. at 6–7; Ruggieri Aff. ¶¶ 2, 14–15, 20.) There is no evidence that Harrington had any personal involvement in the incidents that Ruggieri complains about except for the decision to appoint Gabb as department chair. With respect to that incident, nothing in the record suggests that Harrington attempted to influence Dean MacDonald or Provost Bonaparte, or that he accepted their recommendation of Gabb in retaliation against Ruggieri. At most, Harrington consulted with the University's general counsel to determine whether the Settlement Agreements would permit Ruggieri to serve as a department chair—that alone is hardly sufficient to support an inference that he harbored some retaliatory animus.

■ Equally lacking in substance are Ruggieri's conclusory allegations that members of the University administration and faculty followed Harrington's lead in retaliating against her because they, like Harrington, were "Vincentian priests, or members (or former members of other Catholic religious orders)" and place "great importance … on the traditional clerical values of obedience and loyalty." (Pl.'s Opp. Mem. at 3; Ruggieri Aff. ¶¶ 3, 7.) Her claims are completely lacking in support and do not deserve serious consideration. No reasonable juror could conclude from these baseless assertions that the decisions not to appoint Ruggieri as chair of her department, or to cancel her summer courses, were the product of any retaliatory animus.

---

**8.** The Court notes that when considering the totality of the circumstances to "obtain a realistic view of [plaintiff's] work environment," it appears that Ruggieri has benefitted both financially and professionally in her employment with the University since she filed her original discrimination suit. *Richardson,* 180 F.3d at 437 (quoting *Schwapp v. Town of*

*Avon,* 118 F.3d 106, 111 (2d Cir.1997)). She has received merit awards each year increasing her salary and awarding her bonuses, has been granted teaching reductions while she pursued a law degree, and has secured appointments to various prestigious University committees.

As Ruggieri is thus unable to show a causal connection between her prior suit and the conduct in question, even supposing that she did suffer some adverse employment action, she fails to meet her burden of establishing a prima facie case of retaliation. Summary judgment is therefore appropriate.[9]

### 4. Legitimate, Non–Discriminatory Reasons

 Ruggieri's claims still fail even if the Court were to assume that she had shown a prima facie case of retaliation. Defendants have introduced evidence of legitimate, non-retaliatory reasons for its decisions not to appoint her as department chair and to cancel her summer courses in 1996 and 1997. In turn, Ruggieri is unable to "show[ ] that the defendant's explanations are pretext for the true discriminatory motive," *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 130–31 (2d Cir.1996), or "point to evidence that reasonably supports a finding of prohibited discrimination," *James*, 233 F.3d at 154.

Dean MacDonald, for example, has stated she recommended that Gabb be appointed chair of the Division of Administration and Economics in 1996, despite the faculty vote in Ruggieri's favor, because she had worked closely with Gabb during his term as Acting Chair and was very confident in his ability because of his strong academic credentials—Gabb is apparently the only faculty member in the department with a Ph.D. in economics from an American educational institution—

and his management ability. Indeed, MacDonald had ultimately recommended that Gabb be named Acting Chair in 1995, despite the fact that he had not sought the appointment, and the then current chair, Gibaldi, received sixteen of the seventeen faculty votes cast in the election.

By contrast, MacDonald regarded Ruggieri, as an "inactive" faculty member. (Deposition of Kathleen MacDonald ("MacDonald Dep.") at 236–37.) And Ruggieri herself admits that she had a reduced teaching schedule at St. John's as a result of her enrollment at Brooklyn Law School, attended Faculty Council meetings only to the extent permitted by her law school course schedule, and devoted a substantial amount of her time and energy to law school, including joining the staff of a law journal. Given the circumstances, MacDonald's expressed preference for Gabb because of his superior qualifications for the job in her judgment and because she had worked with him previously as acting chair is legitimate and non-discriminatory. *See, e.g., Scaria v. Rubin*, No. 94 Civ. 3333, 1996 WL 389250, at *8–*9 (S.D.N.Y. July 11, 1996), *aff'd*, 117 F.3d 652 (2d Cir.1997).

In response, Ruggieri is unable to present any evidence that MacDonald's explanation of her preference for Gabb is suspect or, more importantly, that MacDonald was in fact retaliating against Ruggieri. Ruggieri's argument, based on MacDonald's statement in her memorandum recommending Gabb that he was "extremely loyal to the University and to St. Vincent's College," is not persuasive.[10]

---

9. As the Court grants defendants' motion for summary judgment on plaintiff's retaliation claim in its entirety, there is no need to address defendant Harrington's additional contention that he should be dismissed as an individual defendant.

10. Indeed, when read in full, the quoted passage from MacDonald's recommendation let-

ter sets forth legitimate reasons why MacDonald chose to advocate Gabb: "Dr. Gabb is a contributing member of the Dean's cabinet, shares his opinions on issues, policies and procedures, works collegially with the other chairpeople, is willing to assume more duties and is extremely loyal to the University and to St. Vincent's College." (Raisfeld Aff., Ex. 53.)

(Raisfeld Aff., Ex. 53.) Apart from plaintiff's bald assertions, there is absolutely no evidence to suggest that MacDonald was thereby implicitly commenting that Ruggieri had been disloyal for filing her previous lawsuit. MacDonald was not even employed by the University at the time Ruggieri filed her initial EEOC charges and lawsuit, did not know the terms of the Settlement Agreements resolving that dispute, and indeed, had only the "vaguest awareness" of the prior litigation. (Affidavit of Kathleen MacDonald, sworn to March 1, 2000, at ¶ 4.) Moreover, Ruggieri concedes that "all of my dealings with Dean MacDonald have been cordial." (Ruggieri Aff. ¶ 64.)

Provost Bonaparte, who also recommended that Gabb be appointed department chair, and President Harrington, expressed a further legitimate, non-retaliatory reason for not selecting Ruggieri. Both Bonaparte and Harrington believed that Ruggieri's application to be chair was barred by paragraph 5 of the Settlement Agreement, in which Ruggieri agreed "not to apply for, pursue or accept employment in any administrative position." Consistent with this belief, Bonaparte wrote a letter to Ruggieri on April 9, 1996, asking her to withdraw her name from consideration as chair pursuant to paragraph 5 of the Settlement Agreement.

Although Ruggieri strongly contests this interpretation of the Settlement Agreement, her argument does not suggest that Bonaparte's reliance on the agreement was a pretext for retaliation. As discussed below, while it is not plain from the language of the agreement that paragraph 5 in fact bars Ruggieri from being appointed department chair, Bonaparte's reading of the agreement was not per se unreasonable. As the Settlement Agreement's language is ambiguous, even if his interpretation is

ultimately determined to be wrong, Bonaparte could nevertheless have in good faith believed Ruggieri was barred from applying to be department chair and legitimately refused to appoint her on those grounds. Ruggieri presents no evidence that Bonaparte adopted his interpretation of the Settlement Agreements in order to retaliate against her for filing her previous lawsuit. Indeed, she specifically asked in 1995 that Bonaparte serve as the University's administrator responsible for the Settlement Agreements, and her primary University contact with respect to the agreements.

The University has likewise put forward compelling evidence of a legitimate, non-discriminatory reason for cancelling Ruggieri's summer classes at the Staten Island campus in 1996 and 1997—lack of enrollment. In 1995, no students signed up for Ruggieri's Management course. In 1996, only five students had enrolled in Ruggieri's Marketing course as of March. As a result, the University claims that it canceled Ruggieri's 1996 summer Marketing class, and decided not to offer any summer Management or Marketing class in 1997.

Ruggieri's response that she does not believe defendant's proffered explanation is not sufficient to show that it is false, or that the University was actually retaliating against her by cancelling the courses. Ruggieri admits that no students enrolled in her 1995 course, and that as of March, only five students had enrolled in her 1996 course. Her unsupported statements that she "knew of students who wanted to take the [summer 1996] course" and that she "understand[s] other courses ran that summer with as few as four students" are not sufficient to permit the conclusion that she was being retaliated against. (Ruggieri Aff. ¶ 112.) Indeed, Ruggieri's claim of retaliation is belied by the fact that the University offered her the opportunity to teach a course at Queens campus during

the summer of 1997, which she turned down.

Thus, even being extraordinarily generous to Ruggieri, and assuming that she has made out a prima facie case of retaliation, summary judgment would still appropriate. Once an employer puts forward a legitimate, non-discriminatory explanation for its conduct, "all presumptions and special rules drop away; ... the plaintiff, in order to prevail, must have evidence from which the factfinder can reasonably find the essential elements of the claim." *James*, 233 F.3d at 154. In this case, plaintiff's unsupported allegations, which are based almost entirely on surmise, are simply not sufficient to permit a reasonable trier of fact to find that retaliation was the reason that she was not appointed department chair and that her summer classes were canceled.

## B. Breach of Contract

▬ Defendants are also entitled to summary judgment on Ruggieri's breach of contract claim based on the undisputed facts. Although the Amended Complaint does not state expressly which agreement (let alone which provisions of that agreement) Ruggieri claims defendants violated, she argues in her opposition memorandum that defendants breached: (1) Paragraph 1 of the Memorandum Agreement by failing to confer the "Dean Emeritus" title on her and (2) Paragraph 23 of the Settlement Agreement by cancelling her teaching reduction.[11] (Pl. Opp. Mem. at 60–61.) These claims fail as a matter of law.

First, Ruggieri cannot show that defendants breached paragraph 1 of the Memorandum Agreement. That paragraph provides in full:

*"Public Announcement*—Within ten (10) calendar days after the execution of the MEMORANDUM OF AGREEMENT, an "inter-office" memorandum will be disseminated to the University community (the same "mailing list" that received the memorandum regarding RUGGIERI'S removal as Dean of St. Vincent's College) from the Office of the General Counsel, which will state:

> Catherine Ruggieri's discrimination lawsuit has been resolved to the mutual satisfaction of all parties. The University is pleased to announce that in recognition of Professor Ruggieri's contributions as Dean of St. Vincent's College, the University will confer upon her the title of "Dean Emeritus, St. Vincent's College." In accordance with University policy, this appointment will be effective upon the 25th Anniversary of her employment with the University. The parties take this opportunity to reaffirm their mutual commitment to ensure that respect and dignity are accorded to everyone at the University."

(Raisfeld Aff., Ex. 28 ¶ 1.) It is undisputed that on February 14, 1995, Herbert Schwartzmann, St. John's general counsel, issued a memorandum addressed to the "University Community" containing the exact language quoted above. (*Id.*, Ex. 95.) By issuing the memorandum, and thereby prospectively bestowing Ruggieri the title of Dean Emeritus, defendants precisely complied with the terms of the Agreement. Although Ruggieri argues now that the Memorandum Agreement further required the University to issue subsequent announcements in June 1998 when the title became effective or to hold a

---

11. Plaintiff also alleges that defendants' breached Paragraph 5 of the Memorandum Agreement by failing to provide her with a private office. (Pl. Opp. Mem. at 61.) The Court will not address this claim as plaintiff stipulated on August 12, 1999 that she would not seek any relief with respect to that allegation.

celebratory convocation in her honor, her claim is belied by the plain language of the agreement.

Second, Ruggieri also cannot show that defendants, by cancelling her teaching reduction in 1995, infringed on her "rights as a tenured faculty member [under] the terms of the University Statutes, the collective bargaining agreement and any retirement, savings, or other benefit plans of ST. JOHN's" in breach of paragraph 23 of the Settlement Agreement. (*Id.*, Ex. 27 ¶ 23.) She points to no provision of the University Statutes, the collective bargaining agreement, or any University retirement, savings, or benefit plan that indicates that one of the rights of a tenured faculty member is a paid course reduction to pursue an advanced degree. In fact, Ruggieri expressly concedes that "[t]his benefit to St. Vincent's faculty is not even mentioned in the Collective Bargaining Agreement." (Pl. Opp. Mem. at 61.)[12] As Ruggieri cannot demonstrate that she was contractually entitled to a teaching reduction to pursue a law degree, this claim also fails.[13]

## C. Intentional Infliction of Emotional Distress

 The Court also grants defendants' motion for summary judgment on Ruggieri's claim for intentional infliction of emotional distress. To prevail on such a claim under New York law, a plaintiff must show: (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and, (4) severe emotional distress. *See Stuto v. Fleishman*, 164 F.3d 820, 826 (2d Cir.1999). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)). Contrary to Ruggieri's contention, "[w]hether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." *Id.* at 827.

 In this case, Ruggieri offers no evidence that would support a finding of extreme and outrageous conduct. The alleged conduct complained of that occurred within a year of the filing of Ruggieri's complaint[14] includes the University's decision not to allow her to teach a Paralegal Studies course, and its failure to give her timely notice of changes in her teaching schedule, to publicize her Dean Emeritus title, to give her a new access card for the Queens campus, to promptly renew her reserved parking permit, and to prevent unauthorized entry into her office. In the employment context, conduct rarely meets

---

12. Indeed, the collective bargaining agreement provides for a teaching reduction solely for the purpose of conducting research, and such a reduction is granted "within the discretion of the Administration." (Def. Ex. 24 § 8.) The Court therefore does not address defendants' argument that plaintiff's claim is procedurally barred by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, because it calls for an interpretation of the collective bargaining agreement.

13. In any event, plaintiff suffered no damages from the defendants' conduct in this regard because she was ultimately granted a teaching reduction for the remainder of the time she was in law school.

14. The statute of limitations for intentional infliction of emotional distress is one year. *See Peters v. Citibank, N.A.*, 253 A.D.2d 803, 804, 677 N.Y.S.2d 626, 626 (2d Dep't 1998); *Montefusco v. Nassau County*, 39 F.Supp.2d 231, 238 (E.D.N.Y.1999).

the strict standard for intentional infliction of emotional distress without some combination of public humiliation, false accusations of criminal or heinous conduct, verbal threats, permanent loss of employment, or conduct contrary to public policy. *See id.* None of the conduct alleged by Ruggieri meets this standard.

## II. The Defendants' Counterclaim

The Court denies, however, defendants' motion for summary judgment on their breach of contract counterclaim.[15] As discussed above, defendants claim that when Ruggieri applied to be chair of her department in 1996, she breached paragraph 5 of the Settlement Agreement. According to paragraph 5, Ruggieri agreed "not to apply for, pursue or accept employment in any administrative position" for a period of five years or for so long as Harrington is president of St. John's, whichever is longer, and that she would, upon request from the University, immediately withdraw her application for such a position. (Raisfeld Aff., Ex. 27 ¶ 5.) The parties dispute whether the term "administrative position" includes department chairs and have each introduced extrinsic evidence in support of their conflicting interpretations.

In interpreting a contract, a "trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). A court may only construe a contract as a matter of law and grant summary judgment when the contract's language is unambiguous and conveys a definite meaning. *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998); *accord Sayers v. Rochester Tel. Corp. Supplemental Man-*

*agement Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993).

When the court determines that a contract's language is ambiguous, however, and where there is relevant extrinsic evidence as to the parties' actual intent, the "the contract's meaning becomes an issue of fact precluding summary judgment." *Alexander,* 136 F.3d at 86. "An ambiguity exists where the terms of a contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Id.* (quoting *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir.1997)).

In this case, the language of the agreement is ambiguous. It is not readily apparent whether the term "administrative position" includes department chairs. The term could reasonably be interpreted to either include or to exclude department chairs. Ruggieri has submitted an affidavit citing the University Statutes and various internal St. John's memoranda, and stating it is not her understanding that the term "administrative position" as used in the Settlement Agreement pertains to department chairs. (*See* Ruggieri Aff. at ¶¶ 42–57.) Defendants, on the other hand, have submitted affidavits referring to the University Statutes and the collective bargaining agreement, and stating that department chairs have numerous administrative responsibilities. (*See* MacDonald Aff. at ¶¶ 16–17 and Affidavit of Anthony Gabb, sworn to March 1, 2000, at ¶¶ 6–12.)

---

**15.** Defendants initially asserted two breach of contract counterclaims against plaintiff, but withdrew their second counterclaim on August 12, 1999 pursuant a stipulation.

Since the term "administrative position" in the agreement is ambiguous, the parties disagree about its definition, and each side has presented substantial extrinsic evidence supporting their interpretation, summary judgment is not appropriate on this claim at this time.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted as to plaintiff's claims, but is denied with respect to defendants' counterclaim. Defendants are to advise the Court within 10 days of the date of this Order, if it is their intention to pursue their counterclaim in light of this ruling, or if they will withdraw it so this case can be closed.

SO ORDERED.